## Court of Appeals.

November 10, 1903.

## THE PEOPLE v. FRANK WHITE.

(176 N. Y. 331.)

1. MURDER—EVIDENCE.

The evidence upon the trial of an indictment for murder reviewed and held sufficient to sustain a verdict convicting the defendant of the crime of murder in the first degree.

2. APPEAL—BRIEF OF COUNSEL SHOULD CONTAIN A FAIR STATEMENT OF FACTS.

A fair statement of the facts is essential to a proper presentation of an appeal. An unfair statement is certain to be discovered, and when discovered affects the force of the entire brief. When the facts are not open to review they should be stated as found, or as presented to have been found. When the facts are to be reviewed it is proper for counsel to state them as he claims they should have been found in accordance with the weight of evidence, citing the folios where the evidence appears in the record, but on the criminal points he should also state the testimony opposed to his theory, so that the court may have before it a faithful picture of the whole case. A failure to observe these rules increases the labor of the court and reflects upon the integrity of the brief.

3. EVIDENCE—CONFESSION TO OFFICER IN CHARGE OF PRISONER PROCURED BY DECEPTION—CODE CRIM. PROC., SEC. 395.

Cautious and hesitating as courts have always been in regard to confessions made by a person when under arrest to those in authority over him, they have not gone so far as to exclude them, simply because they were procured by deception provided they were voluntarily made.

4. SAME.

In all cases inquiry should be made whether the defendant spoke through fear, or in the expectation of immunity, and when he is under arrest it should also be asked whether he spoke to the magistrate, or to the officer in charge, or in their presence, because he felt that he was compelled to do so for any reason.

5. SAME—CONFESSIONS TO OTHER PRISONERS.

Voluntary confessions made separately to three fellow prisoners held competent, and that the credibility of the witnesses was for the jury.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for Oswego county, December 16, 1901, upon a verdict convicting the defendant of the crime of murder in the first degree. The facts, so far as material, are stated in the opinion.

L. W. Baker and Frederick G. Spencer, for appellant.

Udelle Bartlett, for respondent.

VANN, J.: The homicide which gave rise to this appeal occurred on Sunday, the 15th of September, 1901. At about half-past 3 in the afternoon of that day the body of George Clare, the deceased, was found in a potato patch upon his farm, situated about four miles east of the city of Oswego. The potato patch was an uninclosed part of a large field, eighty rods east of the farmhouse in which Mr. Clare had resided with his family for several years. There were four bullet wounds in the body, one on the radial side of the left forearm, commencing half way between the elbow and wrist and ending just above the outer part of the wrist joint, where the bullet was extracted.

The second was under the left arm and over the fifth rib, the bullet having glanced and entered the breast, where it was found about three inches from the point of entry.

The third bullet entered at the outer angle of the left eyebrow and lodged behind the eye. It did not penetrate the brain, but crushed the orbital arch and caused some congestion through concussion.

The fourth entered " partly on the back, or between the back and the side," cut some slivers from the tenth rib, glanced upward just over the surface of the liver, wounded the lower end of the right lung, passed through the left ventricle of the heart and was found in the front part of the body at the left border of the breast bone.

Neither the first nor second wound was serious; the third would not necessarily have been fatal, although it might have resulted in death from inflammation after a few days, but the fourth, in the opinion of the physician who made the autopsy, caused instant death. The bullets were such as are in common use in revolvers known as number 32 in calibre, and there was no indication, from powder marks on the clothing or otherwise, that they were fired at very close range.

From twenty to twenty-five feet northeast of the body the hat of the deceased was found, and about thirty feet southeast

of that point the vines had been pulled from a hill of potatoes and were lying near it, while there were four or five potatoes on top of the hill. A few days later an axe, somewhat concealed by the grass and weeds, which were thick and high, was picked up a few feet from the potato hill. No pocket book or money or weapon of any kind was found upon the body or near it and no tracks were observed.

The deceased was a well-to-do-farmer, about 52 years of age, who had owned the farm upon which he resided for a good while. His family consisted of his wife, who was about fifteen years younger than himself, William and Russell, grown-up sons by his first marriage, Pearl, a young daughter of Mrs. Clare by her first husband, and the defendant, who had been the "hired man," working on the farm for six weeks. His name is Frank White, but he was there known only as Harry Howard.

During the afternoon before the tragedy all the children went away to spend the Sabbath, and did not return until Sunday night. The defendant also was away the night before, having driven to Oswego with Mr. and Mrs. Clare, but while they returned home he remained in the city until the next morning. Upon their arrival at Oswego the defendant asked the deceased for $2 on account of his wages, when Mr. Clare went with him to a store, took out his pocket book, got a bill changed and handed him the amount asked for. At that time Mr. Clare had a $10 bill, a $5 bill and some smaller bills left, and the defendant had an opportunity to see that he had money in his possession. The next morning Mr. Clare took his pocket book from his pocket to give his wife an account for work that some one had done for him, and she observed, as she testified, that he then had a $5 bill and a $10 bill besides some silver. After. giving her the statement he put his pocket book in the right-hand pocket of his trousers, and he had the same trousers on when he was found dead in the afternoon.

Four or five days before his death Mr. Clare came into the house with the defendant, who is a colored man, but nearly white, and said to Mrs. Clare, according to her evidence: " Our man is going to leave us and you had better watch him and see that he doesn't take anything that doesn't belong to him." The defendant promptly answered, " Mr. Clare, you don't think I would take anything that didn't belong to me, do you," when Mr. Clare said to him, " I never saw a nigger yet that wasn't a thief," and during the conversation charged him with stealing things from the house and called him a thief two or three times. The defendant denied the charge as often as it was made.

· When the defendant was in Oswego the night before the homicide he told a young lady that Mrs. Clare was a very nice woman, but he thought Mr. Clare was mean to her, and added, " It wouldn't be well for him to be mean to her when I am around." ·

The defendant at this time was about twenty years of age and had lived in the county of Oswego for six years. Of a low grade of intelligence, he did not know his own age or the number of his brothers and sisters, or other facts of like character. In the spring of 1901, a few months before the homicide, he was discharged from the jail of Oswego county where he had been confined for a year, during the first six months upon a sentence for assault and battery, and the rest of the time because he failed to give bail to keep the peace. He was arrested soon after he entered the Clare homestead at about 11 o'clock Sunday night. He was first handcuffed and then searched, and among the articles found upon him were fifty-five cents in money, a half-pink bottle one-third full of gin, some powder for the face, a finger ring belonging to Mrs. Clare, which she said was usually kept on a stand in her bedroom, but which had disappeared three days before, and a revolver cartridge of 32-calibre, so embedded in the corner of his right coat pocket as to be somewhat concealed. When the ring was

produced he said he found it in the yard, but on the trial he swore that Mrs. Clare had given it to him. When the cartridge was found he said, apparently with indignation, that some one had put it in his pocket while the search was in progress, but the sheriff and his officers swore that this was not so. In response to questions put by the arresting officer and others he declared that he had been in Oswego all day, and that he took his breakfast and dinner there at Cordingly's Hotel. When asked soon after by the coroner if he had a revolver, he replied that he never had owned or carried one. He also said at different times and in the presence of several persons that he had not been on the Clare farm that Sunday until he came back late at night, but had spent the day at Oswego, except as he went off for a swim, and that he had taken breakfast, dinner and supper at Cordingly's Hotel. On the way to jail he told the sheriff he had arrested the wrong party, and that he ought to have taken Mrs. Clare. He insisted that he was innocent.

On the trial two witnesses testified that about a week before the homicide the defendant, while at a livery stable in Oswego, took a package of tobacco from his pocket, and, in doing so, pulled out a revolver. When asked why he carried it, he said he was held up on the road once and should run no more chances. A pawnbroker of Oswego testified that two or three weeks before Mr. Clare was killed the defendant showed him a small revolver, 32 in calibre, with a pearl handle. It was loaded, and he was told to put it back in his pocket.

The clerk of the Cordingly Hotel testified that the defendant spent Saturday night there, and the next morning paid for his lodging, but that he did not take breakfast or dinner that day, which was the Sunday in question. The defendant, however, returned to the hotel at about 5 o'clock in the afternoon and asked if he could have supper, but was told that it would not be ready until an hour later. The girl who waited on the table at the hotel swore that he took neither breakfast nor dinner

there, but did have supper at about 6 o'clock.    There was other evidence to the same effect.

Many witnesses testified that in the neighborhood of 12 o'clock on the day of the homicide they saw the defendant going east toward the Clare farm and some of them conversed with him.    He was also seen by several witnesses going from the direction of the Clare farm west toward Oswego about 3 o'clock in the afternoon.    Two witnesses saw him come out of an orchard into the highway and start east toward the farm, which was about one mile away.    After they were out of sight he was seen by other witnesses to turn around and walk west toward Oswego.    From the orchard to the farm a person going across through the woods would be substantially concealed from observation.    The defendant was not seen by any witness within less than a mile of the Clare farm on the day in question, until his return late at night.

The sheriff of the county, who kept the jail, testified that the next night after his arrest the defendant asked him what he had heard and the sheriff said:    " We hear enough; you told us last night coming home you didn't have a revolver and weren't out at the Clare's, to-day we locate you with a revolver; it looks bad for you; if we don't get that gun that you shot this man with its going hard yith you."    The defendant replied: " I never shot the man."    The conversation then continued: Q. " Who did shoot this man ? "    A. " Mrs. Clare."    Q. " Where did she shoot him ? "    A. " In the potato field."    Q. " Where were you ? "    The defendant hesitated and then said, " I stood in the lane about forty rods off."    The sheriff said, " Frank, if Mrs. Clare shot this man we have got to have that revolver; we want to convict her.    You can tell us where we can find it, so that we can go and get it."    The defendant replied, " I will go to-night."    The sheriff said, " You can tell us so that we can go just as well," and thereupon the defendant said that he hid the revolver by a beech tree in the first piece of

woods beyond a big corn field. The next afternoon the sheriff took some heavy clothes to the defendant, which he had asked for, and said, " Frank, how came you in that lane ? " The defendant answered that he had a date there with this woman. The sheriff said, " Then you made this up between you," and the defendant replied, " Yes, but she shot him before I got there; he was pulling up a hill of potatoes when she plugged it into him." He then refused to talk further, saying that the sheriff was paid for getting evidence against him.

The next day the sheriff and under-sheriff took the defendant in a hack to the Clare farm, and on reaching a certain point he got out and, handcuffed to one of the officers, led them across lots about eighty rods to a beech tree, pointed toward the roots and said, " You look in there and you will get the gun." A revolver was found at the place indicated, concealed under a covering of leaves and dirt three inches thick, and when it was taken out, the defendant said, " That's the gun." The revolver was of 32-calibre, with a pearl handle, and in it were two empty shells and two loaded cartridges.

After this the defendant did not talk with the sheriff any more, but the under-sheriff wormed himself into his confidence by making him believe he was his friend and wished to help him, and thus by gross deception, but without threats, persuaded him to make further disclosures. On one occasion the sheriff sent for the defendant's shoes, and, when he asked for the reason, the under-sheriff said it was for use in reference to tracks. The defendant then said: " Darn those shoes. I ought to have got it fixed. One of them was worn right through on the ball."

Five days after the revolver was found the under-sheriff said to the defendant, " Things look a little dark; I would like that pocket book or something to work on." The defendant immediately asked, " What kind of a scheme would it be to get

Vol. XVII—35

that pocket book, get it into Mrs. Clare's room, in her bed or somewhere, where it might be found?". The officer replied, "Perhaps a good one," and the defendant said, "supposing we do that?" and was told, "Very well, but where is the pocket book? Can you got and tell us where it is?" and the defendant said he would. The sheriff and under-sheriff at once took him to the Clare farm again and stopped at the point where he directed. Although it was after dark, he led them to a stump not far from the tree where the revolver had been found, and said, "Look in there and you will find the pocket book." A pocket book was found under some dirt and leaves beneath the stump. There were some papers but no money in it, and it was identified as the one which Mr. Clare was in the habit of carrying.

After this the defendant, believing that the under-sheriff was his friend, talked freely with him, and on one occasion told him that he returned to the farm from Oswego, going through a ravine, some woods and a big corn field, and entered the back door of the barn, where he saw Mr. Clare. He told him the cows were in the potatoes, and Mr. Clare went to the house, but came out at once, and they walked along together and drove out the cows. They returned through the potato patch, and while there he said to Mr. Clare, "I wonder how the potatoes are?" Mr. Clare laid down the axe which he had taken in order to repair the fence, stooped over and commenced to dig potatoes with his hands, and as the defendant continued, "I fixed him there." He was asked, "Did you shoot him," and he answered, "Twice. I came back through the big corn field into the woods, hid the pocket book, hid the gun, went through the ravine out into the Hall road and back to Oswego City."

The defendant made separate statements to three fellow-prisoners, according to their testimony, while in jail at Oswego. Frank Cavanaugh, who was confined for petit larceny and had been convicted before for selling whisky without a license and

attempting to break jail, testified that the defendant asked him to tell the sheriff that he shot Mr. Clare that Sunday afternoon, and that Mrs. Clare told him to. He added that he thought this would get him off with a sentence for life. To George Le Clair, who was waiting trial for stealing a horse, he said that after going across lots he entered the barn on the Clare farm, and seeing Mr. Clare, told him the cows were in the potatoes and corn. Mr. Clare said they would go down and drive them out, but before starting he went to the house for a short time. They then drove the cows out, fixed the fence, and while crossing the potato field had an argument in relation to the defendant's wages. The defendant finally said to Mr. Clare, " You son of a bitch, your days are numbered right here," and pulling out a revolver, shot him in the left side and he started to run and " hollered." When about seven feet away he turned round to see if the defendant was coming after him and was shot over the eye, but did not fall. Clare started toward the defendant, put his hands up to defend himself, when the defendant shot the third time and hit him in the arm. Clare then got pretty close to him, and the defendant did not want to get blood on himself, so he sprang to one side, shot again and stayed there until Mr. Clare was dead. He then put his hand into the pockets of the deceased, took out a pocket book and backed away, covering his tracks until he reached a stone wall, when he walked down the wall to the end, jumped off into a heap of brush, got on the grass, walked over to a piece of woods and buried the pocket book, after he had taken $15 out of it. He took three empty shells out of the revolver, put in a good one, hid it under the roots of a tree and left for Oswego. The same witness testified that after this, and but two days before the trial began, he had another talk with the defendant, who asked him to tell the district attorney that he was in the barn drunk; that Mrs. Clare knew he was there and brought him whisky; that she unbuttoned the bosom of her dress, pulled out a pocket book and told him to take the pocket book and revolver

and go hide them or she would shoot him.   The witness further testified that the defendant told him that if he would say this to the district attorney and swear to it, and he swore to it himself, he would get off with a life sentence.

Harvey Halsted testified that he had been convicted of petit larceny three times, but claimed that on one occasion he was innocent.   He swore that in November, after the homicide, the defendant told him that he was in the barn with Mr. Clare, who went to the house for something but came back, and they both went to the lot to put out the cows.   They got into a little dispute; the defendant said to Clare, "Your days are numbered here," pulled out the gun and shot him in the left side.   Mr. Clare whirled and he shot him in the arm and over the eye, and then Clare started to run and he shot him in the back, stayed over him until he was dead, took his pocket book, backed away, brushing out his tracks as he went, got on the stone wall, walked until he came to a grass lot, jumped off into a brush heap and from there went off and planted the gun and pocket book.   He found between twelve and fifteen dollars in the pocket book. He also said in the same conversation that at this time Mrs. Clare was over in the corn lot a little way from the potato patch, so that if he did not make sure of her husband she would; that she had a gun in her stocking leg and he saw the prints of it when she was running for the house from the corn lot.

Mrs. Clare testified that on Sunday morning her husband started to carry the milk to the factory at about twenty minutes of nine, looking at the clock just before and saying he was late. He returned in about two hours, and shortly before Homer Spencer, a neighboring farmer, came in.   Upon the return of Mr. Clare he went with Mr. Spencer to the barn and about one o'clock Mr. Clare came back to the house alone, stayed a few minutes and returned to the barn.   Five minutes later he came to the house, remained for a minute and went out toward the barn.   This was about half-past one or twenty minutes of two, and Mrs. Clare never saw her husband again alive.   She was

getting dinner at the time, and soon after, seeing two young ladies, known as the Sheldon girls, whom she knew well, driving by, she went out and hailed them and invited them in to dinner. They objected at first, but upon her urgent and repeated solicitations, finally hitched their horse and went into the house. Mrs. Clare finished her preparation for dinner, waited a half-hour after the meal was ready, went out on the porch and called her husband, but he did not come and then the three sat down to the table. Just as she finished her dinner, but before the Sheldon girls were through and at about a quarter of three, Spencer returned. Twenty minutes later the girls left when Mrs. Clare and Spencer went to the barn, passed through it, went down a lane to a pair of bars, and at that point she saw a cow in the farther corner of the field where the potato patch was. She told Spencer to go over there and look for Mr. Clare, and if he did not find him to call Mr. Hall who was cutting corn in an adjoining field. Spencer went over toward the cow, and in doing so passed through the potato patch, where he saw the body of Mr. Clare lying, face downward, between the rows. He called Mrs. Clare and Mr. Hall, and both came. No one touched the body, as it was understood that this would not be lawful, until the coroner arrived. Mrs. Clare did not go up close to the body of her husband, but, standing off a little distance, wept and asked Mr. Hall to examine and see if he was dead. Mr. Hall did so without touching the body, and pronounced him dead. No blood was observed at this time. They then went for help, and notified the coroner. Mrs. Clare had a policy of insurance upon the life of her husband for $1,000, which was promptly paid. Mr. Clare owned two farms and left no will.

Spencer, Hall and the Sheldon girls testified to the same story, in substance, so far as their observation extended, but with some variations. Both of the girls observed that Mrs. Clare put the meat that was left after dinner back on the stove to keep it warm. Mr. Hall heard shots during the day, as

he did every Sunday at that time of year, but none in quick succession or from the direction of the potato patch. He was working all day in the field until called over to see the body, except while he was at dinner between one and two o'clock. He thought that he resumed work about a quarter of two, and that it was from one to two hours later when he was hailed by Spencer. The rustling of the corn stalks made some noise which might have affected his ability to hear and the farther end of the rows of corn was quite a distance from the potato patch. Two neighbors, father and son, swore that Spencer was at their house from about half-past twelve until two or half-past. Some of these witnesses were called by the prosecution and others by the defense.

The defendant, sworn as a witness in his own behalf, testified that Mr. Clare gave him $2 on Saturday night and that he had about seventy-five cents or a dollar besides. He spent the night at Cordingly's Hotel and had breakfast in the dining-room, being waited upon by the regular waitress, whom he identified as a witness sworn for the People. After going about town a little while he went over to Black creek to go in swimming. This was a mile or more from the Clare farm and, after dressing, he went through the woods and entered the back door of the barn. On his way he saw a man cutting corn in Mr. Hall's corn field. He went through the barn to the front door, when Mrs. Clare came where he was and said, " Hello, Harry," and he replied, " Hello, Mrs. Clare. Where is Mr. Clare ? " She answered, " I don't know," when he said, " I have a note for him." She asked, " What about," and then pulled him over to the side of the barn, took out a pocket book and revolver and poked them into his right coat pocket. He asked her what that was for, and she said that Mr. Clare and she went down into the corn field and drove out the cows. After fixing the fence they went over into the potato lot and he started to pull up some vines when she shot at him twice. The defendant asked her what for, and she said that she and Mr. Clare had an argument together.

The defendant asked her what she put the things in his pocket for, and she told him to go over somewhere back in the woods and hide them. He said he would like some dinner first, but she told him to go back to the city after he hid the things and not to come back until night, because she had company and didn't want him around there. He then hid the revolver and pocket book, one by a stump and the other at the side of a beech tree; started for Oswego, and reached there at about half-past four or five o'clock. He took supper at six, walked around town a while, procured a bottle of gin and returned to the Clare farm, reaching the house between eleven and twelve o'clock. Soon after he was arrested, handcuffed and searched. When the cartridge was found he denied, with some warmth, that he ever put it in his pocket, and said that the arresting officer or somebody else had put it in. He declared that he found the ring in the yard, took it to Mrs. Clare, who gave it to him, saying that he had been a good boy, but asking him not to wear it when Mr. Clare could see it on him. He admitted that he owned a revolver, which he bought two or three months before, with a box of cartridges, but said that he left it with the cartridges in his stand drawer when he went to Oswego Saturday night. He testified that he was dosed with whiskey in the jail until he told where the revolver and pocket book were. He admitted that he went with the officers and pointed out the places where the articles were hid, but insisted that he was drunk at the time. He denied absolutely making the statements to Cavanaugh, Le Clair and Halsted as sworn to by them. He said that he did not open the pocket book, but observed three shells in the revolver just before he buried it. He was not positive that the revolver in evidence was his, but said that it was just like the one he had. He denied substantially, but not all, the statements that the sheriff and under-sheriff testified he had made to them, and swore that before he told where the revolver was the under-sheriff said he wanted it to put in Mrs. Clare's bed.

The defendant's testimony at the critical point, where he stated what took place between Mrs. Clare and himself in relation to hiding the revolver and pocket book, was given with great hesitation, and seven different times he was urged, by court or counsel, to " go on."

Mrs. Clare, when recalled, denied the story told by the defendant about the revolver and pocket book and swore that she did not see him during the day. She also denied that she had given him the ring. There was evidence tending to show that the construction of the barn was such as to make it impossible for her to pull him over to the north, as he testified. Two witnesses swore that he said he did not see Mrs. Clare that day. Six witnesses testified that no whiskey was ever given to prisoners in the jail, and the three officers in charge said that none was at any time given to the defendant.

There was much more evidence, but, having stated the salient points, we are compelled to omit the rest in order to restrict our opinion to reasonable limits. It is obvious that, independent of the alleged confessions, there was a case for the jury. Four shots were fired in succession, and the last bullet, which caused immediate death, entered the back part of Mr. Clare's body, apparently when he was trying to escape. This warrants the inference that the fatal shot was fired with the deliberate and premeditated design to effect death, and characterizes the crime as murder in the first degree. (People v. Ferraro, 161 N. Y. 365; People v. Majone, 91 N. Y. 212.)

There was some evidence of motive, inadequate to be sure, but, as we have said, while the motive to murder can never be adequate, it may be obvious. The criminal records of this court show that even a smaller sum of money than Mr. Clare is supposed to have had upon his person when he was killed has been the sole inducement to the gravest of crimes. Our records also show that insulting words, recently uttered, sometimes inflame the mind and lead to murder for the purpose of revenge.

The defendant had the means and the opportunity of perpetrating the crime. The revolver used was his own, and he admits that he was at the Clare farm at about the time of the murder. He hid the pocket book and the revolver. While the money was not found upon him, and he was not shown to have spent it, still it appeared that he was in Oswego for four or five hours during the evening after the homicide, and that he there had an opportunity to dispose of it.

The statements of a person made when he is first charged with a crime have some bearing upon the question of his guilt. (People v. Conroy, 97 N. Y. 62, 80.) They are by no means conclusive, and undue weight should not be given them, for innocent men sometimes lie in order to divert suspicion from themselves. When the defendant was arrested he denied that he had a revolver, or that he was at the Clare farm during the day of the homicide, and insisted that he took dinner at Cordingly's Hotel, but these, with other statements, were not only shown to be false, but he admitted they were false, when on the witness stand. He himself pointed out the places where he had hidden the revolver and the pocket book and told how he approached the Clare farm in the shelter of the forest. He neither denied nor explained why, when he came out of the orchard and saw the carriage, he at first walked back toward the farm and after the carriage was out of sight, turned around and went on toward Oswego.

His effort to fasten the crime upon Mrs. Clare has little support in the evidence, aside from his own testimony and his conflicting statements threw doubt upon his final story. His hesitation at a suggestive point in his testimony may have been owing to the excitement caused by his situation, or to the natural difficulty of describing that which never happened. It was for the jury, who saw and heard him testify, to decide whether he spoke the truth. The evidence against him was so strong that it would have been strange if they had accepted his account with no substantial corroboration.

No exception was argued by the learned counsel for the defendant, whose brief would have been of greater aid to the court if it had stated the facts fairly and had cited the folios where the evidence to support his statements could be found. A fair statement of the facts is essential to a proper presentation of an appeal. An unfair statement is certain to be discovered, and when discovered affects the force of the entire brief. When the facts are not open to review they should be stated as found, or as presumed to have been found. When the facts are to be reviewed, it is proper for counsel to state them as he claims they should have been found in accordance with the weight of evidence, citing the folios where the evidence appears in the record, but on the crucial points he should also state the testimony opposed to his theory, so that the court may have before it a faithful picture of the whole case. A failure to observe these rules increases the labor of the court and reflects upon the integrity of the brief.

There was but one exception to the charge, which was afterwards waived, and the exceptions relating to evidence do not merit discussion. It is insisted that whether the point is raised by exception or not, the confessions of the defendant should not have been received, or at least should not have been submitted to the jury for consideration, because those made to the under-sheriff were obtained by improper methods, while those made to fellow-convicts were unreliable, not only on account of the character of the witnesses, but because those witnesses were in charge of the sheriff and subject to his influence.

It is provided by statute that the confession of a defendant may be given in evidence against him unless it was made upon a stipulation for freedom from prosecution, or under the influence of fear produced by threats. It is not, however, sufficient to warrant a conviction, without additional proof that the crime has been committed. (Code Crim. Proc., sec. 395.) There was evidence to bring all the confessions within the permission of the statute, but none to bring any of them within the

prohibition thereof, except the statement of the defendant himself, which was denied by several witnesses. It is clear from the facts already stated that the confessions were corroborated— one in nearly every particular and the others in several substantial particulars. The statute does not require corroboration in every respect, in order to authorize a conviction upon confessions, but only in the single particular, " that the crime charged has been committed." (People v. Deacons, 109 N. Y. 374, 377; People v. Jaehne, 103 N. Y. 182, 199.) While we do not sanction the deception practiced by one of the officers in charge of the defendant, the court could not exclude the confessions made to him on that account. Deception was used in order to induce the defendant to tell the truth. No inducement was held out to him to confess guilt unless there was guilt. The confession to the under-sheriff was made to him, not as a public officer, but as a supposed friend. It is not sufficient to exclude a confession by a prisoner, as we have held, " that he was under arrest at the time, or that it was made to the officer in whose custody he was, or in answer to questions put to him, or that it was made under the hope or promise of a benefit of a collateral nature." (Cox v. People, 80 N. Y. 500, 515.) Confessions induced by the use of decoy letters, by the false assertion that some of the accomplices of the prisoner were in custody, or made to a detective disguised as a confederate, or upon the promise that they will not be disclosed, have been received in evidence with the sanction of courts of high authority. (Campbell v. Commonwealth, 84 Pa. St. 187; Commonwealth v. Knapp, 9 Pick. 496; Commonwealth v. Tuckerman, 10 Gray, 173; State v. McKean, 36 Iowa, 343; State v. Fastner, 43 Iowa, 474.)

Cautious and hesitating as courts have always been in regard to confessions made by a person when under arrest to those in authority over him, they have not gone so far as to exclude them simply because they were procured by deception, provided they were voluntarily made. (People v. Wentz, 37 N. Y. 303.)

They are careful, however, to leave the credibility of the witness who practiced the deception and the circumstances under which the confessions were made to the consideration of the jury. The test is whether the prisoner had any inducement to tell a falsehood against himself, or felt compelled to speak for any reason when he preferred to remain silent. (Balbo v. People, 80 N. Y. 484, 499; Murphy v. People, 63 N. Y. 590; Commonwealth v. Knapp, supra; Wharton Criminal Ev. [9th ed.] sec. 658.)

In all cases inquiry should be made whether the defendant spoke through fear, or in the expectation of immunity, and when he is under arrest it should also be asked whether he spoke to the magistrate, or to the officer in charge, or in their presence, because he felt that he was compelled to for any reason. The competency of a confession is to be determined by the trial court upon the facts in evidence at the time it is offered. It is proper, and such was the course pursued in this case, to allow a preliminary examination by the defendant's counsel to test its competency before it is received. After it is received, if a question of fact arises as to its voluntary character, the jury should be instructed to wholly disregard it, unless they find that it was voluntarily made, without threat or menace by acts, words or situation, and without compulsion, real or apprehended, and without the promise, express or implied, that the defendant should not be prosecuted, or that he should be punished less severely.

The question of fact whether any of the confessions fell within the prohibition of the statute or of the rules of evidence was submitted to the jury and they were instructed to disregard them if they were made under the influence of fear produced by actual or covert threats, or through promises, acts of intimidation or other unlawful means and unless they were voluntary, fairly obtained and not procured by inquisitorial compulsion or other improper methods. The defendant cannot justly complain of the course thus pursued by the trial judge, which was

authorized by a recent decision of this court. (People v. Cassidy, 133 N. Y. 612, 613.)

The confessions, made separately to the three prisoners, were competent, and the credibility of the witnesses was for the jury. There is no evidence that any of these witnesses was under the influence of threats or hope or that the defendant's statements to them were not wholly voluntary. While the confessions differ in some substantial particulars, they agree in others of the utmost importance. The situation and condition of the body, the location of the stone wall, hat, axe and potato hill with the potatoes lying on top, the fact that the cows were out and that an axe was needed to fix the fence and other facts proved beyond doubt, are of peculiar significance when considered in connection with the confessions.

The charge of the court was impartial, clear and comprehensive. At its close the counsel for the defendant stated that they had no exception to it and nothing but commendation for it. The record is free from reversible error. The verdict was not against the weight of evidence nor against law, and justice does not require a new trial.

The judgment should, therefore, be affirmed.

PARKER, Ch. J., GRAY, O'BRIEN, BARTLETT, HAIGHT and MARTIN, JJ., concur.

Judgment of conviction affirmed.