(91 App. Div. 331.)

PEOPLE v. MILLS.

(Supreme Court, Appellate Division, First Department. February 11, 1904.)

1. CRIMINAL LAW—INDICTMENT—COUNTS.
Where a verdict was general, and in terms found the defendant guilty of a felony as charged in the indictment, the conviction will be sustained if either count in the indictment states an indictable offense.

2. SAME—BRIBERY—EVIDENCE.
Evidence *held* sufficient to authorize a finding that the accused attempted to bribe the district attorney's office to procure and deliver to him indictments against a friend and to suppress further investigation in a homicide case.

3. SAME—PRINCIPAL.
Under the express provisions of Pen. Code, § 29, one concerned in the commission of crime, whether he directly commits it or aids in its commission, and one who, whether present or absent, procures another to commit a crime, is a principal.

4. SAME—REMOVAL OF PAPER FROM PUBLIC OFFICE.
One who, by bribing a representative of the district attorney's office, secured possession of indictments against another, to destroy them, violated Pen. Code, § 94, prohibiting, under penalty, the willful and unlawful removal of a paper filed in a public office by authority of law.

5. SAME—GRAND LARCENY.
Under Pen. Code, § 531, subd. 3, making it grand larceny in the second degree to steal or unlawfully obtain a record of a court or officer filed according to law in any public office, one who, by bribing a representative of the district attorney's office, secured possession of indictments against another, was guilty of such crime.

6. SAME—ATTEMPT—APPEAL.
Under Pen. Code, § 685, providing that one may be convicted of an attempt to commit a crime, though it was consummated, unless the court discharges the jury and directs a trial for the crime itself, one accused of crime cannot complain that he was indicted and convicted only of an attempt, when he might have been convicted of the principal crime.

7. SAME—TRESPASS NOT NECESSARY.
It is not necessary that a trespass should have been committed to establish the crime of larceny.

¶ 1. See Criminal Law, vol. 14, Cent. Dig. § 2099; Indictment and Information, vol. 27, Cent. Dig. § 651.

8. SAME—APPEAL—EVIDENCE OF ADDITIONAL CRIME.

On a trial and conviction for removing files from a public office and for grand larceny, the accused cannot complain that the evidence also showed his commission of the crime of bribery, as defined by Pen. Code, § 78.

9. SAME—FEIGNED COMPLICITY OF OFFICER.

Where one sought to bribe the district attorney's office to deliver him certain indictments, it does not affect his guilt that a representative of the office feigned complicity with him, and afforded him facilities for the accomplishment of the crime.

10. SAME—EVIDENCE—ADMISSIBILITY.

Where one was accused of an attempt to remove from a public office indictments against a friend, in connection with an effort to have prosecutions against him stopped, evidence of the examination by the district attorney's office of the circumstances of a death and the connection therewith of the accused's friend was competent as showing the motive for the removal of the indictments.

Van Brunt, P. J., dissenting.

Appeal from Trial Term, New York County.

George E. Mills was convicted of felony in attempting to remove certain indictments from a public office where they were filed according to law, and appeals. Affirmed.

See 83 N. Y. Supp. 947.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

John R. Dos Passos, for appellant.
Robert C. Taylor, for the People.

HATCH, J. The notice of appeal herein purports to be an appeal from a judgment convicting the defendant of the crime of grand larceny in the second degree. No such judgment of conviction was entered in this case, nor was there any indictment or verdict upon which it could be based, but, as the notice of appeal also specifies that it is from each and every part of the judgment which was rendered, it is perhaps sufficient. The people raise no point in respect thereto, and we consider the case upon the assumption that the notice of appeal is sufficient to bring up the judgment and the record upon which it was based.

The indictment contained two counts: One for the crime of an attempt to commit the crime of willfully and unlawfully removing "certain indictments which had been found against one Richard C. Flower, wherein he was charged with the crime of grand larceny in the first degree, which indictments, at the time of the attempt to commit the crime, were deposited ·in a public office by authority of law." The indictment herein purports to be based upon the provisions of section 94 of the Penal Code, which makes the act committed in violation of its provisions a felony. The second count charges the defendant with the crime of an attempt to commit the crime of grand larceny in the second degree, and is based upon the provisions of subdivision 3 of section 531 of the Penal Code, which provides that a person is guilty of grand larceny in the second degree who steals or unlawfully obtains or appropriates "a record of a court or officer, or a writing, instrument or record kept, filed or deposited according to law, with, or in keeping of any public office or officer." By the pro-

visions of section 35 of the Penal Code a defendant may be convicted of the crime charged therein, or of a lesser degree of the same crime, or of an attempt to commit the crime so charged, or of an attempt to commit a lesser degree of the same crime; and by virtue of the provisions of section 685 a person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime was consummated, unless the court discharges the jury and directs the defendant to be tried for the crime itself. Section 686 provides for the punishment of a person who attempts to commit a crime. The two counts of the indictment specify particular crimes, arising out of the same acts claimed to have been committed by the defendant, and they each charge the offense to have been committed in the removal of six indictments against Richard C. Flower for the crime of grand larceny in the first degree. It is averred in the present indictment that the Flower indictments were regularly found and were filed in the particular office, as required by law, and that they were attempted to be removed therefrom by the defendant. Section 272 of the Code of Criminal Procedure provides that an indictment, when found, is required to be presented by the foreman in the presence of the grand jury and the court, and must then be filed with the clerk and remain in his office as a public record. · The verdict of the jury was general, and in terms found the defendant guilty of a felony, as by the indictment is alleged against him. The verdict being general, the conviction is to be sustained if either count in the indictment states an indictable offense. People v. Davis, 56 N. Y. 95. As the crimes specified in the indictment constitute an offense against the law, the defendant therein was properly convicted, if the evidence established the commission of the offense beyond a reasonable doubt.

It is claimed by the learned counsel for the defendant that the evidence developed upon the trial did not disclose the commission by the defendant of an indictable crime, or of an attempt to commit a crime, and the disposition of this question involves a consideration of the testimony given upon the trial. It appeared that Richard C. Flower was a physician, and was also engaged in promoting certain mining interests. In connection with such enterprises he was indicted under six different indictments for alleged larcenies, and was also suspected of being implicated in the suspicious death of one Hagaman, which case the district attorney was investigating shortly prior to the offenses charged in the present indictment. Francis P. Garvan, an assistant district attorney of the county of New York, had special charge of the prosecution of the indictments against Flower, and also of the investigation of the death of Hagaman. The defendant was a lawyer, engaged in the practice of his profession in the city of New York with a son of Richard C. Flower, and he was also interested in various mining companies in connection with Dr. Flower and Andrew D. Meloy and others at the time when the indictments were found against Flower, and when he was being otherwise investigated, and he took a very lively interest in Dr. Flower's behalf. It appeared from the testimony of Meloy that he was president and a member of the board of directors of the Lone Pine Mining Company, of which board of directors the defendant was a member; that on Saturday, March 28,

1903, at a directors' meeting of this mining company, the defendant called attention to the prosecutions against Dr. Flower, and stated that it was having a bad effect upon the company, that he thought Garvan was persecuting Flower, that the ends of justice were not being promoted, and he expressed a wish that the directors should pass some resolution asking Garvan or the district attorney's office to discontinue the attack upon Flower. Such resolution, however, was neither adopted nor offered. Meloy testified that on the next day he received a telephone message from the defendant asking him to meet him on Riverside Drive, about Eighty-Fifth or Eighty-Sixth streets; that he met him there alone, and had a conversation with him, in which he spoke of Flower's increasing difficulties about his counsel, what they had done, and what his anxieties and fears were. He discussed Garvan and the latter's attitude to the case, and asked Meloy if he would not make an engagement with Garvan so that the defendant could see and have a talk with him, and see if the prosecutions could not be stopped, and there was some conversation about the money which had been paid for counsel, and that if it were given to Garvan it would accomplish greater results. The defendant finally said:

"'I will not give Hart any money or any lawyer. * * * I know the head of this thing, and I am going to give what money I give to Garvan. * * * What I want to do is to get in contact with Garvan, and I want you to do that for me.' * * * When he stated he wanted to get in contact, I asked him if he knew what he was doing—what he was about. He said he thought he did. Then I said the same general remark—be careful. At the end of the conversation I left Mr. Mills, and stated I would see Mr. Garvan the next day and make an engagement."

Meloy further testified that he asked the defendant why he did not get in touch with Garvan himself, and in reply the defendant stated, in substance, that if he came himself Mr. Garvan would be afraid, but that "you could arrange it for him." Meloy then parted from the defendant with the understanding that he was to see Garvan and make an appointment for him the next day. Meloy, however, took an entirely different course. The next day he consulted with his own counsel, telling him what had occurred. Thereupon his counsel and himself interviewed Garvan over the telephone, with the result that the three had a meeting in the afternoon, and the whole matter of the conversation was stated to Garvan, after which Mr. Jerome, the district attorney, was brought into the conference and informed of what had taken place. Jerome testified that on the next day after the conference he communicated with Detective Sergeant Brindley, and gave him directions concerning the case, as a result of which he was to put himself into communication with the defendant for the purpose of detecting him in the commission of any crime which he might commit or attempt to commit. Meloy had no communication with Brindley, but the latter called him up on the telephone for the purpose of making arrangements by which he could meet the defendant. Meloy then saw the defendant, informed him that he had seen Garvan, and made arrangements for him to meet Garvan's wardman, Brindley. The defendant demurred to this, stating that he wanted to meet Garvan. Meloy then told him that Garvan would not do business with him di-

rectly, but that he would have to do it with Brindley, and thereupon the defendant consented to see him, and Meloy, in the defendant's presence, called up Brindley by telephone at the district attorney's office and told him that the defendant would meet him. As a result of this, the defendant and Brindley met in the afternoon in Haan's Restaurant, No. 11 Park Row, in the city of New York. After identifying each other, they went into one of the booths, when Mills stated that he had been instructed by Dr. Flower to have an interview with Garvan about the disposition of the charges against Flower. Brindley informed him that it was impossible for him to see Garvan, and defendant said, "Well, Dr. Flower is anxious for me to talk to Garvan, and I do not see why he does not want to talk to me as a lawyer to lawyer; that would be all right;" and, when informed that this was impossible, he said, "Well, if you can assure me that you can fulfill any contract or proposition that I make to you, I am willing to talk to you." After some further conversation defendant stated:

"That Dr. Flower was a fool to have let the matter go as far as it did, as the opportunity was presented to him when Mr. Garvan had him in his office for examination in the Hagaman matter; that this was his time for to make a settlement instead of fighting out, and that now he has engaged high-priced counsel who would drag the case out so as to justify a large fee.  *  *  *  He would go to the fountain head, and settle the case. I asked him then, 'Well, what is it you want us to do?' He says, 'Well, these indictments that have been found against Dr. Flower, you can withdraw them and misplace them, lose them, or dispose of them in some way, or Mr. Garvan could go into court and permit him to go into court on a demurrer, and have the indictments quashed.' I told him I would see Mr. Garvan and submit this to him, and let him know. He then said: 'Well, Mr. Garvan ought to be satisfied with this. The matter is not worth as much money now as it would have been to us if it had been disposed of before indictment and all of this publicity. Dr. Flower's business has suffered very much from this, and, of course, it is not worth the money it would have been before the publicity.' He said that, as to the Hagaman matter, Mr. Garvan could say that after thorough examination of witnesses, and the autopsy, and the examination of the report of the physician and chemist, he had come to the conclusion that the death of Mr. Hagaman was caused by natural causes, and that this would relieve both Dr. Flower and his client, Mrs. Hagaman—that is, Mills' client—of this notoriety.  *  *  *  He said he would have to see Dr. Flower, so as to make arrangements for the money; that Dr. Flower is an old bird at this game, has had twenty years' experience, and would be very particular about arranging these matters."

After arranging that the defendant should be known thereafter as McChesney, the parties separated. This conversation was repeated by Brindley to Jerome, and thereupon Jerome applied to the court having the custody of the indictments, explained to the court how he desired to use them, without, however, mentioning any name, and the court permitted them to be taken from the files of the office, and Jerome delivered them to Brindley. In the afternoon of the next day the defendant telephoned Brindley at the district attorney's office that everything was all right; that he had seen Dr. Flower, and "that it would be a go." At 12 o'clock of that day Brindley and the defendant again met at Haan's Restaurant, when the defendant asked:

" 'As to those indictments, what have you done?' I says: 'Well, pursuant to your suggestion yesterday about these indictments, I have inquired as to what effect it would have, and find that there are copies in the district attorney's office of these indictments.' He says: 'Yes, that is right. By taking

these indictments, the originals, the copies could be made demurrable, and Mr. Garvan could go into court, and with all apparent good faith argue our motion to demur on those indictments, and of course the judge would decide against him.' He says: 'But how do we know as to your good faith in those other matters that may come up in the future?' 'Well,' I says, 'you would have possession of the indictments then, and that would be evidence of good faith on our part.' He says: 'Yes, but I do not want those indictments. I will take them from you—buy them—and would go somewheres with you and destroy them.' I says, 'Well, I have withdrawn those indictments, have given no reason why I did, and have them with me,' and I showed them to him. He took them and examined them. After carefully examining them he says: 'Well, there are only five indictments here, and there has been no indictment on the bribery charge. That makes that the easier to dispose of. One prisoner already having been discharged, it would be an easy matter for Mr. Garvan to have the other one discharged.' He said, 'I will have to see Dr. Flower to get the money, and will try to find him by 5 o'clock this afternoon.' I said, 'Well, that would be after banking hours, and would be rather late,' and he says, 'Well, I will have to try to find him somewheres.' I then said, 'Well, what amount did you want to pay for this service?' He says, 'Well, $1,500.' I says I thought that was rather cheap. He said, 'Well, I will make it $2,000 in this way: $1,500 to be paid to Mr. Garvan, and $500 you and I will divide.'"

Brindley consented to this, and after some further conversation the parties separated, agreeing to meet again later in the afternoon. Subsequently the defendant called Brindley over the telephone, stating that he could not make the arrangements for that day, would have to postpone it to the next. Brindley replied that it was a risky thing for him to keep the indictments out of the Court of General Sessions. "He said, 'Well, under no conditions put them back; keep them out. It will be all right. You can make any excuse—say you cannot find them—but keep them out, any way.'" The parties had prior to this time agreed to refer to the indictments as "subpœnas," and the money as "additional evidence." A meeting was arranged for next day, at which time Brindley posted in Haan's Restaurant other officers and persons to observe what transpired between him and the defendant. He met the defendant shortly after 1 o'clock at Haan's Rathskeller, and after considerable conversation with respect to the Hagaman matter, and what might occur in the future with respect to complaints against Dr. Flower, defendant said:

"'I have the money here, and we can do more business in the future.' He put his hand in his inside pocket and withdrew an envelope—this one (indicating)—and passed it to me and said, 'Just count it; there is $1,500.' The envelope was open when he handed it to me. I took it from him, from his hand. I looked into it. It had fifteen one hundred dollar bills in it. I counted them. They are there now. [The envelope and money were then received in evidence.] Defendant then said: 'This is for Mr. Garvan. Give this to Mr. Garvan. You and Mr. Garvan can settle for this $1,500.' He said: 'Look out; be careful.'"

Thereupon the defendant called attention to certain persons who were observing them, and Brindley told him they were all "grafters." He then gave to Brindley $250 more, and said, "The other $250 I have in my pocket." Brindley then produced the indictments, which the defendant examined, and finally suggested, as they were being watched, that they go upstairs. He picked up the indictments, placed them in his outside pocket, walked to the stairway leading to the café upstairs, when Brindley placed him under arrest. He was searched

in the presence of other persons in the café, the indictments were found upon him, and he was taken to the station house. The defendant admitted that the indictments were found upon his person at the time of his arrest, and he did not deny but that he had meetings with Brindley, as testified to by the latter, or but that the money which was produced in court and introduced into evidence was given by him to Brindley at the place and time that the testimony established. The defendant's claim in answer thereto was that he and Brindley were engaged in buying up claims against Dr. Flower, and that in all the negotiations which he had with Brindley he was acting as the representative of Flower against creditors and their attorney, Mr. Hart, from whom he was to receive releases to be delivered to him by Brindley; but he admits that Brindley produced the indictments, told him what they were, that he looked at them, and subsequently put them in his pocket at the request of Brindley.

The evidence was abundantly sufficient from which the jury were authorized to find that the defendant was engaged in an attempt to bribe the district attorney's office and those who represented it, and to procure them to deliver to him the indictments in order to secure their destruction and to suppress further investigation in connection with the Hagaman matter. The answer which defendant made, and the story which he told, in view of the admitted facts, was highly improbable, and it is not at all surprising that the jury rejected the defendant's version, and no doubt exists in our minds but that upon the evidence the verdict of the jury ought not to have been otherwise than it was.

The defendant, however, contends that, admitting all this evidence to be true, it is not sufficient to establish the commission of the offense, the attempt to commit which was charged in the indictment. It is plain from the testimony of Meloy that the defendant was the instigator of the scheme to corrupt Garvan and to procure relief in some form for Dr. Flower. The scheme took the form of a removal and destruction of the indictments. When the proposition was made either by or to Brindley to secure possession of the indictments, it was the intention of the defendant to have them permanently removed from the files of the court. He directed Brindley over the telephone under no circumstances to return the indictments to the files of the court, but to retain possession of them until he could see him. When he met Brindley, he received the indictments and took possession and control of them, intending thereby to permanently remove them from the clerk's office and destroy them. Having proposed the scheme and set in motion the forces by which the indictments were actually removed from the files of the court and delivered to him, every act, from the inception of the scheme to its final consummation by the delivery of the indictments, was the act of the defendant, no matter by whom it was performed, and it constituted him a principal in the transaction. Section 29, Pen. Code; People v. Bliven, 112 N. Y. 79, 19 N. E. 638, 8 Am. St. Rep. 701; People v. Peckens, 153 N. Y. 576, 47 N. E. 883. When the defendant possessed himself of the indictments it was in pursuance of the scheme which he had instigated and of the forces which he had set in motion. He intended

to permanently remove the indictments and destroy them. Such intent was felonious; in consequence of which the crime committed by him was completely committed when he possessed himself of the indictments with such intent. As the purpose was to remove and destroy the indictments, and as such act was willful and unlawful, the offense committed is brought squarely within the crime defined in section 94 of the Penal Code.

The place where the indictments were kept was in the clerk's office of the Court of General Sessions. The indictments were written records, kept, filed, and deposited according to law in a public office and with a public officer. The indictments, therefore, answered the description contained in subdivision 3 of section 531 of the Penal Code, and, as the defendant is shown to have unlawfully obtained them, he was brought within the provisions of this section.

The fact that he was not indicted as a principal is of no consequence, for under the provisions of the Penal Code and the Code of Criminal Procedure, to which we have heretofore called attention, he could be properly convicted of the offense of attempting to commit the crime. It does not lie in the mouth of the defendant to complain that he was not indicted for and convicted of the principal crime. It was an act of mercy upon the part of the court that permitted his conviction of the offense for which he was indicted.

Nor was it necessary that a trespass should have been committed in order to fully establish the crime of larceny. It is now no longer necessary, to constitute larceny, that the property should have been taken from the possession of the owner by a trespass. People v. Laurence, 137 N. Y. 517, 33 N. E. 547. But if the trespass was necessary, it is found in the actual taking from the custody of Brindley, as that operated in law the same as though the defendant had physically removed them from their place of custody.

We are also quite willing to agree with the learned counsel for the defendant that the acts proved upon the trial showed the commission of the crime of bribery as defined in section 78 of the Penal Code, and perhaps in other sections; but we are not able to see. how the defendant can be heard in complaint that he was also guilty of some other crime in addition to that for which he was indicted and convicted. It may be that, if the complaint in this respect is genuine and serious, the public prosecutor may apply to mitigate it by procuring the defendant to be indicted and convicted for such offense.

It is claimed, however, that the learned district attorney lured and entrapped this defendant into an act of criminality, and with full knowledge of all of the circumstances induced the defendant to commit the crime, and that under such circumstances no crime is committed, even though, if it had been done in the absence of such inducing causes, it would have constituted the commission of a crime. This view ignores entirely the evidence given by Meloy, and accepted by the jury, that the defendant was the original actor in instigating the scheme by and through which, in some form and manner, and by the use of felonious means, Garvan was to be corrupted, and Flower relieved from being called upon to answer for the crimes for which he then stood indicted. There was no act of the district attorney or Officer

Brindley which prompted the defendant in his wicked purpose. They did not lure him to the commission of crime. He sought to commit it, and, believing that the scheme and forces which he had set in motion were being operated to that end, he pursued them with avidity, and the officers whom the learned counsel for the defendant has charged with doing improper acts did no more than place the facilities in the way for the criminal to act out to the end his wicked purpose; and feigning complicity in his acts by the officers for the purpose of his exposure and to bring him to justice were acts which have been frequently employed in many ways and forms to thwart criminal purpose, expose the offender, and bring him to justice, and in so doing such officers discharged a public duty and fulfilled the functions which they have been selected to perform. The authorities are abundant supporting the exercise of this right and the performance of this duty, and the perpetrators of criminal acts have never been permitted to shelter themselves thereunder, and thereby escape the punishment due to their crimes. People v. Gardner, 144 N. Y. 119, 38 N. E. 1003, 28 L. R. A. 699, 43 Am. St. Rep. 741; People v. Krivitzky, 60 App. Div. 307, 70 N. Y. Supp. 773, affirmed on appeal, 168 N. Y. 182, 61 N. E. 175; Andrews v. U. S., 162 U. S. 420, 16 Sup. Ct. 798, 40 L. Ed. 1025; Grimm v. U. S., 156 U. S. 604, 15 Sup. Ct. 470, 39 L. Ed. 550. In the learned note by Mr. Francis Wharton in Bates v. U. S. ([C. C.] 10 Fed. 92), the distinctions are stated and many authorities are collected. After discussing the cases in which decoys and traps were resorted to to detect persons engaged in perpetrating crime, wherein the person has been excused from the effects of his act, and those which have been held to be proper, he states the general principles in these words:

"The only exceptions known to the principle before us exist (1) in cases in which to the offense it is essential that it should be 'against the will' of the party injured; and (2) in cases in which the offense consists in certain physical conditions which cannot exist if a trap be laid.

"(1) When it is a condition to an offense that it should be 'against the will' of the party injured, then there must be an acquittal, should it appear that such party invited the defendant to the commission of the offense. This is the case with regard to prosecutions for rape [citing cases], to prosecutions for assaults, which are not in themselves offenses against the public peace [citing cases].

"(2) When there are physical conditions of an offense inconsistent with a trap. so that these conditions cannot exist when there is a trap, then the defendant must be acquitted. The most striking illustration of this exception is to be found in the case of a burglary. There can be no prosecution for burglary in cases where the door of the house was opened by its owner to give the burglar entrance. Whether, when the offense is the special product of the trap, the defendant can be convicted, depends upon the exclusiveness of the casual relationship between the offense and the trap. When the defendant is the passive tool of the entrapping party, then there should be an acquittal. On the other hand, the defendant ought not to escape conviction in any case (with the exceptions above given) in which he knowingly committed the offense."

This excerpt correctly states the rule of law and the principle upon which it rests. Where the person injured is the inducing cause to the commission of the offense, no offense is committed, because in law he cannot be deemed to be injured by an act which he was instrumental in procuring to be done; but, where the act is the prompting of a

wicked spirit and the actor is not a passive instrument, but takes affirmative steps in instigating, and acts of his free will until the commission of the offense is complete, no well-considered case yet reported has held that such actor was not responsible for the crime committed. The facts proved in this case answer every requirement of this principle of law. The crime itself was not committed against any individual, nor could it be. It was a crime purely against the public as such. It sought to arrest the course of judicial procedure and to destroy evidence upon which alone it could be based. Under such circumstances the mere facilitation for purposes of detection of the defendant in the commission of his offense was in no wise improper, nor can the defendant invoke such acts as a defense. Board of Excise v. Backus, 29 How. Prac. 33; People v. White, 176 N. Y. 331, 68 N. E. 630; People v. Adams, 176 N. Y. 351, 68 N. E. 636.

We do not feel called upon to examine or to comment upon the numerous cases cited by the defendant, and by which he seeks to controvert these rules. None of them are in conflict with the authorities to which we have called attention. For the most part they are cases of burglary or common-law larcenies, where the consent of the owner to the perpetration of the offense destroyed the power to commit it, and the rule that we have announced recognizes such fact. We have examined them all, and find that none of them conflicts with the rule announced in Mr. Wharton's note, from which we have quoted.

The exceptions taken in the course of the trial were numerous. We find it necessary, however, to discuss but one. Mr. Garvan was called as a witness, and testified that he was in charge of the homicide bureau in the district attorney's office, and that he had charge of an investigation into the death of a man named Hagaman. This was objected to as incompetent, irrelevant, and inadmissible. The objection was overruled, and an exception was taken thereto. The witness then proceeded to state the circumstances in connection with such investigation, from which it appeared that Hagaman died September 10, 1901. Subsequently the circumstances of his death were found to be suspicious, the body was exhumed, an autopsy performed, and a chemical analysis made of certain organs of his body. Dr. Flower and Mrs. Hagaman and a great number of other witnesses, having knowledge of the circumstances surrounding his death, were examined. It is defendant's claim that this evidence was manifestly prejudicial to the defendant's rights; that it was collateral to the issue, and therefore essentially incompetent. The existence of the investigation into the death of Hagaman and Dr. Flower's connection with it was one of the inducing causes which prompted the defendant to the commission of this offense. This appears clearly in all the testimony. The knowledge of Garvan upon such subject, and his state of mind with respect to Dr. Flower's connection with the death, was one of the things which the defendant sought to influence, and to induce Garvan to abandon the investigation, both upon Dr. Flower's account and on account of the defendant's client, Mrs. Hagaman. The existence, therefore, of this investigation, and the attitude of Garvan towards it, was highly important testimony as bearing upon the motive which prompted the defendant to the commission of the offense, and evidence bearing upon

such question has always been held to be admissible. As said by Judge O'Brien in People v. Sutherland, 154 N. Y. 345, 48 N. E. 518: "The motive for the commission of a homicide is always open to inquiry at the trial, and considerable latitude is always allowed." If the facts developed in the investigation of Hagaman's death were of such a character as to show criminal acts upon the part of Dr. Flower or Mrs. Hagaman in connection therewith, the clearer and stronger would appear the motive which moved the defendant to a commission of this crime; but whether strong or weak is of no consequence upon the subject of the admissibility of the testimony. As it bore directly thereon, it was neither collateral, nor was it prejudicial, except as it operated as an element in the proof to convict the defendant of a crime, and that is not such prejudice as the law recognizes. There are no other questions in the case which require discussion.

We reach the conclusion that the defendant was justly convicted, and his crime was clearly established. Judgment of conviction should therefore be affirmed. All concur, except VAN BRUNT, P. J., who dissents.