## Court of Appeals.

April, 1904.

## THE PEOPLE v. GEORGE E. MILLS.

(178 N. Y. 274.)

1. CRIMES—RECEIVING PROPERTY OF THE STATE FROM ANY ONE, UNDER ANY CIRCUMSTANCES, WITH INTENT TO STEAL IT, IS A CRIME.

Where an individual owner delivers his property to one who wishes to steal it, there is no trespass, but where the property of

the state is delivered by any one, under any circumstances, to any person for the purpose of having him steal it and he takes it into his possession with intent to steal it, there is a trespass and the attempt is a crime.

**2. THEFT OF PUBLIC RECORDS—PENAL CODE, §§ 94, 531.**

The instigator of a plot to obtain possession of certain indictments for the purpose of destroying them, by bribing an assistant district attorney having them in his special charge to remove them from the files of the court and deliver them to him for a consideration to be agreed upon, and who, after a feigned compliance with the scheme by an intermediary pretending to act for such officer, receives the indictments, puts them in his pocket and walks away, whereupon he is immediately arrested and the indictments are taken, is properly convicted, under section 94 of the Penal Code, of an attempt to commit the crime of willfully and unlawfully removing documents from a public office, and, under section 531, of the attempt to commit the crime of grand larceny in the second degree.

**3. DELIVERY OF PUBLIC RECORDS BY PUBLIC OFFICER TO ONE WITH THE INTENT TO HAVE HIM STEAL THEM NO DEFENSE TO PROSECUTION FOR THEFT UPON THE GROUND THAT THE STATE, THROUGH ITS REPRESENTATIVE, ATTEMPTED TO CREATE A CRIME.**

The fact that the district attorney, upon being informed of the scheme, directed his employees to seemingly comply therewith, and for the sole purpose of apprehending the defendant in the commission of a crime and of securing his subsequent conviction, procured the indictments with the consent of a judge out of court and ordered their delivery to the defendant, is not available as a defense upon the ground that the object of the district attorney was not to detect but to create a crime, and that the defendant was innocent because he took the indictments into his possession with the consent of the state as represented by the district attorney. The indictments were the property of the state which no court, even by formal order, could lawfully direct to be removed for any purpose, except as provided in section 866 of the Code of Civil Procedure, certainly not for the purpose for which they used; they were not in the lawful possession of the district attorney; he could not lawfully give them away or permit them to be taken by the defendant, and the latter's appropriation of them with the intent to steal was as much a crime as though he had with such intent removed them from the records himself. The state detects and punishes crime after its commission, but there can be no such thing as the state tempting a citizen to its commission for the purpose of detecting and punishing it. The district attorney could not and did not represent the state, although he thought he did, and his sole desire was to ren-

der it official service.  His acts, therefore, exceeded his authority, were individual, did not bind the state and did not estop it from prosecuting and convicting the defendant. ,

4. WHEN THE DEFENDANT IS A PRINCIPAL.

The defendant having proposed the scheme and put in motion the forces by which the indictments were actually removed from the ·files of the court, was a principal throughout the transaction; but if he had not instigated it, if he took them animo furandi from any place or from any person, either with or without consent, he was guilty of the offenses charged.

People v. Mills, 91 App. Div. 331, affirmed.*

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered February 17, 1904, which affirmed a judgment entered upon a verdict convicting the defendant of an attempt to commit the crime of grand larceny in the second degree, and of an attempt to commit the crime of willfully and unlawfully removing certain public documents from the custody of the officer to whom they were confided by law.

The indictment against the defendant contains two counts, each charging an attempt to violate a distinct section of the Penal Code, the first being founded on section 94 and the second on section 531.   The facts appearing on the trial, as well stated by the Appellate Division, are as follows :   " Richard C. Flower was a physician and was also engaged in promoting certain mining interests.   In connection with such enterprise he was indicted under six different indictments for alleged larcenies, and was also suspected of being implicated in the suspicious death of one Hagaman, which case the district attorney was investigating shortly prior to the offenses charged in the present indictment.

---

*For opinion of Dugro, J., refusing stay, see 41 Misc. 195; 17 N. Y. Crim. 466.

Francis P. Garvan, an assistant district attorney of the county of New York, had special charge of the prosecution of the indictments against Flower and also of the investigation of the death of Hagaman. The defendant was a lawyer, engaged in the practice of his profession in the city of New York with a son of Richard C. Flower, and he was also interested in various mining companies in connection with Dr. Flower and Andrew D. Meloy and others at the time when the indictments were found against Flower, and when he was being otherwise investigated, and he took a very lively interest in Dr. Flower's behalf.

It appeared from the testimony of Meloy that he was president and a member of the board of directors of the Lone Pine Mining Company of which board the defendant was a member ; that on Saturday, March 28, 1903, at a directors'. meeting of this mining company, the defendant called attention to the prosecutions against Dr. Flower, and stated that it was having a bad effect upon the company; that he thought Garvan was persecuting Flower ; that the ends of justice were not being promoted, and he expressed a wish that the directors should pass some resolution asking Garvan, or the district attorney's office, to discontinue the attack upon Flower. Such resolution, however, was neither adopted nor offered. On the next day Meloy testified that he received a telephone message from the defendant asking him to meet him on Riverside drive about Eighty-fifth or Eighty-sixth streets; that he met him there alone, had a conversation with him in which he spoke of Flower's increasing difficulties, about his counsel, 'what they had done and what his anxieties and fears were. He discussed Garvan and the latter's attitude to the case, and asked Meloy if he would not make an engagements with Garvan so that the defendant could see and have a talk with him and see if the prosecutions could not be stopped, and there was some conversation about the money which had been paid for

counsel, and that if it were given to Garvan it would accomplish greater results. The defendant finally said: "I will not give Hart any money or any lawyer. * * * I know the head of this thing and I am going to give what money I give to Garvan. * * * What I want to do is to get in contact with Garvan and I want you to do it for me. * *

* When he said he wanted to get in contact, I asked him if he knew what he was doing, what he was about ; he said he thought he did. Then I said the same general remark—be careful. At the end of the conversation I left Mr. Mills and stated I would see Mr. Garvan the next day and make an engagement." Meloy further testified that he asked the defendant why he did not get in touch with Garvan himself, and in reply the defendant stated, in substance, "that if he came himself Mr. Garvan would be afraid, but that you could arrange it for him." Meloy then parted from the defendent with the understanding that he was to see Garvan and make an appointment for him the next day. Meloy, however, took an entirely different course. The next day he consulted with his own counsel, telling him what had occurred. Thereupon his counsel and himself interviewed Garvan over the telephone, with the result that the three had a meeting in the afternoon and the whole matter of the conversation was stated to Garvan, after which Mr. Jerome, the district attorney, was brought into the conference and informed of what had taken place. Jerome testified that on the next day after the conference he communicated with Detective Sergeant Brindley and gave him directions concerning the case, as a result of which he was to put himself into communication with the defendant for the purpose of detecting him in the commission of any crime which he might commit or attempt to commit. Meloy had no communication with Brindley, but the latter called him up on the telephone for the purpose of making

arrangements by which he could meet the defendant.' Meloy then saw the defendant, informed him that he had seen Garvan and made arrangements for him to meet Garvan's wardman, Brindley. The defendant demurred to this, stating that he wanted to meet Garvan. Meloy told him that Garvan would not do business with him directly, but that he would have to do it with Brindley, and thereupon the defendant consented to see him, and Meloy, in the defendant's presence, called up Brindley by telephone at the district attorney's office and told him that the defendant would meet him. As a result of this, the defendant and Brindley met in the afternoon in Haan's restaurant, No. 11 Park Row in the city of New York. After identifying each other they went into one of the booths, when Mills stated that he had been instructed by Dr. Flower to have an interview with Garvan about the disposition of the charges against Flower. Brindley informed him that it was impossible for him to see Garvan, and defendant said : ''Well, Dr. Flower is anxious for me to talk to Garvan and I do not see why he does not want to talk to me just as lawyer to lawyer, that would be all right.'' And when informed that this was impossible, he said, ''Well, if you can assure me that you will fulfill any contract or proposition that I make to you I am willing to talk with you.'' After some further conversation defendant stated: ''That Dr. Flower was a fool to have let the matter go as far as it did, as the opportunity was presented to him when Mr. Garvan had him in his office for examination in the Hagaman matter; that this was his time for to make a settlement instead of fighting it out, and that now he has engaged high-priced counsel who would drag the case out so as to justify a large fee; *  *  * he would go to the fountain-head and settle the case. I asked him then, 'Well, what is it you want us to do?' He says, 'Well, these indictments that have been found against Dr. Flower you can

withdraw them and misplace them, lose them or dispose of them in some way or Mr. Garvan could go into court and permit him to go, into court on a demurrer and have the indictments quashed.' I told (him) that I would see Mr. Garvan and submit this to him and let him know. He then said, 'Well, Mr. Garvan ought to be satisfied with this; the matter is not worth as much money now as it would have been to us if it had been disposed of before indictment and all of this publicity; Dr. Flower's business has suffered very much from this, and, of course, it is not worth the money it would have been before the publicity.' He said that as to the Hagaman matter, 'Mr. Garvan could say that after thorough examination of witnesses and the autopsy and the examination of the report of the physician and chemist, he had come to the conclusion that the death of Mr. Hagaman was caused by natural causes, and that this would relieve both Dr. Flower and his client, Mrs. Hagaman—that is Mills' client of this notoriety.' * * * He said he would have to see Dr. Flower so as to make the arrangements for the money ; that Dr. Flower is an old bird at this game, has had twenty years' experience and would be very particular about arranging these matters." After arranging that the defendant should be known thereafter as McChesney, the parties separated. This conversation was repeated by Brindley to Jerome, and thereupon Jerome applied to "a judge of" the court having the custody of the indictments, explained * * * how he desired to use them, without, however, mentioning any name, and the "judge" permitted them to be taken from the files of the office and Jerome delivered them to Brindley. In the afternoon of the next day the defendant telephoned Brindley at the district attorney's office that everything was all right; that he had seen Dr. Flower and "that it would be a go." At twelve o'clock of that day Brindley and the defendant again met at Haan's restaurant, when the defendant asked " 'as to those indict-

ments, what have you done ?' I says, 'Well, pursuant to your suggestion of yesterday about these indictments I have inquired as to what effect it would have, and find that there are copies in the District Attorney's office of these indictments.' He says, 'yes, that is right; by taking these indictments, the originals, the copies could be made demurrable, and Mr. Garvan could go into court and with all apparent good faith fight our motion to demur on those indictments, and, of course, the judge would decide against him.' He says, 'but how do we know as to your good faith in those other matters that may come up in the future ?' 'Well,' I says, 'you would have possession of the indictments then, and that would be evidence of good faith on our part.' He says, 'yes, but I do not want those indictments; I will take them from you, buy them and would go somewheres with you and destroy them.' I says, 'well, I have withdrawn those indictments, have given no reason why I did and have them with me,' and I showed them to him. He took them and examined them. After carefully examining them he says, 'well, there are only five indictments here, and there has been no indictment on the bribery charge ; that makes that the easier to dispose of; one prisoner already having been discharged, it would be an easy matter for Mr. Garvan to have the other one discharged.' He said, 'I will have to see Dr. Flower to get the money and will try to find him by five o'clock this afternoon.' I said, 'well, that would be after banking hours and would be rather late,' and he says, 'well, I will have to try to find him somewheres.' I then said, 'well, what amount did you want to pay for this service ?' He says, 'well, $1,500.' I says I thought that was rather cheap. He said, 'well, I will make it $2,000, in this way, $1,500 to be paid to Mr. Garvan and $500 you and I will divide.'" Brindley consented to this, and after some further conversation the parties separated, agreeing to meet again later in the afternoon. Subsequently the defendant

called Brindley over the telephone, stating that he could not make the arrangements for that day; would have to postpone it to the next. Brindley replied that it was a risky thing for him to keep the indictments out of the Court of General Sessions. "He said, 'well, under no conditions put them back; keep them out; it will be all right; you can make any excuse—say you cannot find them, but keep them out, anyway.'" The parties had prior to this time agreed to refer to the indictments as "subpœnas" and the money as "additional evidence." A meeting was arranged for next day, at which time Brindley posted in Haan's restaurant other officers and persons to observe what transpired between him, and the defendant. He met the defendant shortly after one o'clock at Haan's rathskeller, and after considerable conversation with respect to the Hagaman matter and what might occur in the future with respect to complaints against Dr. Flower, defendant said : ",I have the money here, and we can do more business in the future.' He put his hand in his inside pocke: and withdrew an envelope—this one (indicating)—and passed it to me and said, 'just count it; there is $1,500.'. The envelope was open when he handed it to me. I took it from him, from his hand. I looked into it; it had fifteen one hundred dollar bills in it. I counted them ; they are there now." The envelope and money were then received in evidence. Defendant then said : "This is for Mr. Garvan ; give this to Mr. Garvan, you and Mr. Garvan can settle for this $1,-500." He said : "Look out, be careful." Thereupon the defendant called attention to certain persons who were observing them and Brindley told him they were all "grafters." He then gave to Brindley $250 more and said: "The other $250 I have in my pocket." Brindley then produced the indictments, which the defendant examined and finally suggested as they were being watched that they go upstairs. He picked up the indictments, placed them in his

outside pocket, walked to the stairway leading to the cafe
upstairs when Brindley placed him under arrest.  He was
searched in the presence of other persons in the cafe, the
indictments were found upon him and he was taken to the
station house.  The defendant admitted that the indict-
ments were found upon his person at the time of his arrest,
and he did not deny but that he had meetings with Brind-
ley, as testified to by the latter, or but that the money
which was produced in court and introduced into evidence
was given by him to Brindley at the place and time that the
testimony established.  The defendant's claim in answer
thereto was that he and Brindley were engaged in buying up
claims against Dr. Flower, and that in all the negotiations
which he had with Brindley he was acting as the repre-
sentative of Flower against creditors and their attorney, Mr.
Hart, from whom he was to receive releases to be delivered
to him by Brindley ; but he admits that Brindley produced
the indictments, told him what they were ; that he looked at
them and subsequently put them in his pocket at the request
of Brindley."

The jury found the defendant guilty upon both counts and
he was sentenced accordingly.  Upon appeal to the Appel-
late Division the judgment was affirmed, one of the justices
dissenting, and the defendant thereupon came to this court.

John R. Dos Passos, Benjamin S. Steinhardt and Edmund
F. Harding for appellant.  The defendant, under the evi-
dence disclosed, committed no indictable crime, either the
principal offense or an attempt to commit it.  (Beccaria on
Crimes [ed. 1705], 7; Connor v. People, 18 Col. 373;
O'Brien v. State, 6 Tex. App. 665; Commonwealth v.
Bickings, 12 Penn. Dist. Rep. 206; State v. Hayes, 105
Mo. 76; People v. Collins, 53 Cal. 185; State v. Stickney,
53 Kans. 308, 36 Pac. Rep. 714; State v. Hull, 33 Oreg. 56;

Williams v. State, 56 Ga. 391.) There was no evidence to show that defendant was guilty of a violation of sections 94 and 531 of the Penal Code, under which he was indicted. (Thorn v. Turck, 94 N. Y. 95; Zink v. People, 6 Abb. [N. C.] 413; 77 N. Y. 114; People v. Nichols, 3 Park. Cr. Rep. 579; 17 N. Y. 114; Dodge v. Brittain, Meigs, 83, 85; People v. Gardner, 144 N. Y. 125.)

William Travers Jerome, District Attorney (Robert C. Taylor of counsel), for respondent. As defendant's felonious intent was fully shown, his participation in the removal of the indictments constituted an attempt to violate section 94 of the Penal Code and also an attempt to commit grand larceny in the second degree, in violation of section 531, subdivision 3, of the Penal Code. (People v. Lawrence, 137 N. Y. 517; People v. Bliven, 112 N. Y. 91; People v. Cotto, 131 N. Y. 597; People v. Peckens, 153 N. Y. 576; King v. Higgins, 2 East, 5; People v. Bush, 4 Hill, 135; People v. McDermott, 5 Park. Cr. Rep. 102; Bish. New Crim. Law [8th ed.], §§ 767, 768; Rex v. Lawrence, 4 Cox C. C. 438; Rex v. Walsh, 1 Mood. C. C. 14; Harrison v. People, 50 N. Y. 518.) The proposition that Mills' possession of the indictments was lawful ; that the district attorney had presented Mills with the indictments and that the district attorney had power to bind the state so as to make the transfer of the indictments lawful is untenable. (1 Bish. New Crim. Law, §§ 257, 262; Riley v. State, 16 Conn. 47; Forsythe v. State, 6 Ohio, 20; Grimm v. United States, 156 U. S. 604; People v. Krivitzky, 168 N. Y. 182.) The claim that the deception perpetrated upon defendant has the effect of leaving him guiltless when the evidence is weighed in the balance is untenable. (Matter of Cross, 85 Hun, 343; Hopt v. Utah, 110 U. S. 574; People v. White, 176 N. Y. 331; People v. Noelke, 29 Hun, 461; Winston v. Winston, 165 N.

Y. 553; Grimm v. U. S., 156 U. S. 604; Goode v. U. S., 159 U. S. 663; Rosen v. U. S., 161 U. S. 29; Andrews v. U. S., 162 U. S. 420, People v. Krivitzky, 168 N. Y. 182.)

VANN, J.

The indictments against Dr. Flower were records or documents filed in a public office under the authority of law. (Code Crim. Pro. § 272; Code Civ. Pro. § 866.) They were the property of the state and a willful and unlawful removal of them constituted a crime under section 94 of the Penal Code. Any one who unlawfully obtained or appropriated them was guilty of grand larceny in the second degree, according to the provisions of another section of the same statute. (Penal Code, § 531.) Whoever is guilty of violating either section may be convicted of an attempt to commit the offense specified therein, even if it appears on the trial that the crime was fully consummated, unless the court in its discretion discharges the jury and directs the defendant to be tried for the crime itself, which was not done in the case before us. (Code Crim. Pro. §§ 35 and 685.) The jury found the defendant guilty of an attempt both to remove and to steal the indictments, and after affirmance by the Appellate Division we are confined in our review to such questions as were raised by exceptions taken during the trial.

In view of the able and exhaustive opinion of the Appellate Division, the only question we feel called upon to consider is that raised by the challenge of the learned counsel for the appellant in the nature of a demurrer to the evidence. He claims that even on the assumption that all the evidence for the prosecution is true, still the facts thus proved do not constitute the crime charged in either count of the indictment. His argument is that the object of the district attorney was not to detect, but to create a crime, and that

no crime was committed by the defendant in taking the indictments into his possession, because he took them with the consent of the state as represented by the district attorney.

The flaw in this argument is found in the fact that the records were the property of the state, not of the district attorney, and that the latter could not lawfully give them away or permit them to be taken by the defendant. Purity of intention only could prevent the. action of the district attorney from being a crime on his part. This is true also as to the detective, for if either had in fact intended that the defendant should permanently remove the indictments, and steal, appropriate or destroy them, he would have come within the statute. Neither of those officers represented the state in placing the records where the defendant could take them, but each was acting as an individual only. Neither had the right or power, as a public officer, to deliver them to the defendant, and if either had acted with an evil purpose, his act would have been criminal in character.

An act done with intent to commit a crime, and tending but failing to effect its commission, is an attempt to commit that crime. (Penal Code, § 34.) Felonious intent alone is not enough, but there must be an overt act shown in order to establish even an attempt. An overt act is one done to carry out the intention, and it must be such as would naturally effect that result, unless prevented by some extraneous cause. In People v. Bush (4 Hill, 133) the prisoner solicited one Kinney to burn a barn, and gave him matches for the purpose, and it was held sufficient to warrant a conviction for attempt at arson, although the prisoner did not mean to be present at the commission of the offense, and Kinney did not intend to commit it. The furnishing of the matches was the overt act. If the defendant did anything with intent to steal the papers, which in the ordinary course of events, unless interfered with, would have resulted in the

theft thereof, it was an overt act.    (People v. Sullivan, 173
N. Y. 122, 133.)    Taking up the records, putting them in
his pocket and walking away with them was an overt act,
because it was done with the intent to remove and appropri-
ate them, and would ordinarily result in carrying that inten-
tion into effect.    It was a trespass to take the indictments
into his possession under the circumstances, for he did it, as
the jury found, with the intention of stealing them.    It was
not necessary that the trespass should be accompanied with
violence, as it was enough for him to secure the physical
custody of the papers and have it in his power to take them
away and appropriate them, the same as if he had picked
them up in the clerk's office.    No more force would be
required in the case supposed than in the case proved.
The touch of a pickpocket is so light that it cannot be felt,
yet the force is sufficient to constitute a trespass and an
attempt to commit a crime, even if there is nothing in the
pocket to steal.    (People v. Moran, 123 N. Y. 254.)    As
was said by the court in a late case :    "It is now the estab-
lished law, both in England and in this country, that the
crime of attempting to commit larceny may be committed,
although there was no property to steal, and thus the full
crime of larceny could not have been committed."    (People
v. Gardner, 144 N. Y. 119, 125, and cases cited.)

Knowing that he had no right to the indictments, and
that the officers had no right to let him have them, when
the defendant picked them up from the table and put them
in his pocket animo furandi, the law presumes that the act
was done vi et armis, for the amount of violence is not
important.    He removed the papers from the control of the
real owner and had them in his own control, so that the
state could not have recovered possession without his con-
sent or by forcibly taking them away from him, which was
in fact done.    The detective could only get them back if he
and his assistants were strong enough, unless the defendant

voluntarily gave them up. He had the same control of them that he had of his own pocket book, for both were in his pocket and neither could be taken from him except by the use of force. Temporary possession, though but for a moment, by one who intends to steal is enough, and possession "is the having or holding or detention of property in one's power or command." (Harrison v. People, 50 N. Y. 518.) As was said by Judge Folger in the case cited, quoting with approval from an old manuscript of a distinguished judge : "If every part of the thing is removed from the space which that part occupied, yet the whole thing is not removed from the whole space which the whole thing occupied, the asportation will be sufficient; so, drawing a sword partly out of its scabbard will constitute a complete asportavit." The defendant picked up the papers from the table; he held them in his hand ; he put them in his pocket and was walking away with them when he was arrested. In whose possession were they at that time if not in his, and how did they get there unless by his unauthorized, physical interference with them? The district attorney did not authorize him to take them, for he could not and the defendant knew that he could not. Neither the district attorney nor the detective stood for the state of New York in placing them where the defendant could get them, for no court or officer has that power under the law. The statute expressly prohibits a record or document "whereof a transcript duly certified may by law be read in evidence," from being "removed, by virtue of a subpoena duces tecum from the office in which it is kept; except temporarily, by the clerk having it in custody, to a term or sitting of the court of which he is clerk; or by the officer, having it in custody, to a term or sitting of a court or * * * referee, held in the city or town where his office is situated." Where it is required at any other place, for use as evidence, it may be removed by order of the court "entered in the minutes;

specifying that the production of the original, instead of the transcript, is necessary." (Code Civ. Pro. § 866.)

This is the only statute which confers any power on the court in relation to the subject and, clearly, it did not authorize the court to allow the district attorney to take the indictments in question for the purpose of giving them away, even temporarily, or permitting them to be taken into possession by one who wanted to steal them. An order made for such a purpose would be void, but no order of the kind was actually made by the court, or "entered in the minutes." The district attorney told one of the judges, out of court, what he wanted of the indictments, and, to use his own words, "that I desired to keep them over night, but I did not want to go to the clerk's office about it and that I did not want to do it without the consent of some judge and he was the only judge in the building and he consented." While such consent gave some moral support to the district attorney, it added not a whit to his legal powers. The Code of Criminal Procedure requires that an indictment "must be filed with the clerk and remain in his office as a public record." (§ 272.) No one is authorized to take it away, except when it is needed as evidence, or in court upon the trial of the accused. We have recently held that a record made for the purpose of identifying a convict and kept in the office of the superintendent of state prisons, could not be given away or surrendered, even after the person convicted had been acquitted upon a new trial granted through appeal. We declared that the record was beyond the control of the superintendent except for preservation and use, and that even the courts could not compel him to give it up without express authority from the legislature. (Matter of Molineux, 177 N. Y. 395, 398.)

If the district attorney had had the indictments in his possession for use in court in prosecuting Dr. Flower, such possession would have been the possession of the state, for

it would have been lawful and in the line of his duty. When, however, he had them in his possession for the purpose of delivering them to the defendant, or letting him take them with intent to carry them away and destroy them, such possession was not that of the state, for the district attorney was not then acting in an authorized or official capacity, although it is conceded that he thought he was.

As the defendant "proposed the scheme and put in motion the forces by which the indictments were actually removed from the files of the court and delivered to him," we agree with the Appellate Division that he was a principal throughout the transaction. (Penal Code, § 29; People v. Bliven, 112 N. Y. 79; People v. Peckens, 153 N. Y. 576.) However, even if he had not instigated the scheme pursuant to which the indictments were removed from the office of the clerk and brought where he could put his hands upon them, still, if he then took them into his possession with intent to steal them, knowing what they were and where they came from, he was guilty of the offense charged. It was unnecessary for him to remove them from the clerk's office, but was sufficient if he took them animo furandi from any place, or from any person, either with or without consent.

We shall not review the authorities cited on either side, for that duty has been so thoroughly discharged by the Appellate Division that we can throw no further light upon the subject. We merely state that an important distinction between this case and those relied upon by the appellant is found in the difference between public and private ownership of the property taken by the accused. In most cases some third person is injured by the crime and is directly or indirectly the complainant, but in this case the state was, as it must be in all criminal cases, the prosecutor and it was also the injured party, for its property was the subject of the attempt at larceny. If

an individual owner voluntarily delivers his property to one who wishes to steal it there is no trespass, but when the property of the state is delivered by any one, under any circumstances, to any person for the purpose of having him steal it and he takes it into his possession with intent to steal it, there is a trespass and the attempt is a crime. The state did not solicit or persuade or tempt the defendant, any more than it took his money when he handed it over to the detective. Neither did the district attorney, as such, but Mr. Jerome did, acting as an individual, with the best of motives, but without authority of law and, hence, his action did not bind the state. While the courts neither adopt nor approve the action of the officers, which they hold was unauthorized, still they should not hesitate to punish the crime actually committed by the defendant. It is their duty to protect the innocent and punish the guilty. We are asked to protect the defendant, not because he is innocent, but because a zealous public officer exceeded his powers and held out a bait. The courts do not look to see who held out the bait, but to see who took it. When it was found that the defendant took into his possession the property of the state with intent to steal it, an offense against public justice was established and he could not insist as a defense that he would not have committed the crime if he had not been tempted by a public officer whom he thought he had corrupted. He supposed he had bought the assistant district attorney when he handed over the money, but he knew he had not bought the state of New York and, hence, that the assistant had no right to give him its property for the purpose of enabling him to steal it.

The judgment of conviction should be affirmed.

O'BRIEN, J. (dissenting).

This case is sui generis. There is no case in this state

that I have been able to find that is at all substantially similar. The cases cited in support of this conviction at the bar and in the courts below are well enough in their way, but they do not touch the vital question involved in the case. This will be seen upon an examination of the cases themselves in connection with the views herein expressed. After a careful examination of the record, the first thought that impresses the mind has been admirably expressed by an eminent judge of the highest court in the land in a famous case which has just been decided in that court :

"Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law for the future, but because of some question of an immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." There is in this case, doubtless, something of immediate overwhelming interest which distorts the judgment and leads it away from the real principles that ought to control the decision.

The defendant was indicted and convicted for an attempt to steal six indictments that had been filed by the grand jury against a certain Dr. Flower. He, it seems, was a director and manager of a mining corporation, and in connection with his transactions concerning the stock of that corporation he was indicted for stealing certain moneys that it is said he received upon a sale of the stock. The particular facts upon which the indictments rest are of no consequence; it is enough for us to know that they were presented by the grand jury in the usual course and were on file in the proper office. The defendant is an attorney at law, and was a director in the same corporation, and was a friend of Flower. A man named Meloy was also a director, who had some

quarrel or dispute with the defendant and Flower concerning the management of the corporation.  He had some dispute or quarrel with the defendant in the corporate meetings and was really an enemy of the defendant, though he professed to be a friend.  The desire for revenge still nestled in his bosom, and that doubtless is a sufficient explanation for his conduct in the transaction which will be presently related. The transaction is a very remarkable one, and although it appears at length and with considerable detail in the large record before us, it can be compressed into a very brief statement.  In stating the case I will aim to give it the coloring which is most unfavorable to the defendant and will wholly reject his own version of the transaction.

On or about the 29th of March, 1903, the defendant called up Meloy on the telephone and asked him to meet him at a designated place in New York.  This meeting took place, and Meloy testifies that the defendant made at that interview the following statement to him:  The defendant said in substance that there had been a large amount of money spent for counsel in the Flower case, and that if the money had been given to the district attorney, or one of his deputies, the prosecution would have long since ceased, and the defendant suggested to Meloy that the latter make an engagement for an interview with an assistant district attorney.  In other words, the defendant disclosed to Meloy in plain words a project to bribe the district attorney, or rather his assistant, to make away with the indictments, or to terminate the prosecution by some proceeding in court upon a demurrer.  There can be no doubt whatever that the defendant entertained the design to terminate the prosecution upon these six indictments by bribery.  The exact course to be followed was evidently not clear in his mind and was to await further development.  This of course was a project that shocks our sense of propriety and arouses at once a prejudice against the defendant.  It is the one thing in this

case that distorts the judgment and is liable to lead courts away from the legal question involved in the case. When the interview was finished and Meloy and the defendant parted, it was agreed that Meloy was to see the assistant district attorney and arrange an interview between the latter and the defendant. Here Meloy found his opportunity to get even with the defendant and in that way settle their old quarrel. Instead of going to see the assistant, as he had led the defendant to believe, he went to his own lawyer and disclosed to him the conversation and proposal which had been made by the defendant to him. He and his counsel then proceeded to call upon the assistant the same day and informed him of the conversation that Meloy had had with the defendant. The assistant immediately asked Meloy and his counsel to accompany him to the office of the district attorney where these four persons had an interview, and then, or perhaps at a subsequent one, a plan was arranged by which the district attorney agreed to obtain from the files of the court the six indictments which were pending against Flower and to deliver them into the custody of a detective in his office who would meet the defendant with the indictments and obtain from him a proposition for the delivery of them to the defendant upon payment of a certain sum which the detective would represent would go to the assistant.

Subsequently to the interview which resulted in the foregoing plan, Meloy, acting under the instructions of the district attorney and of his own counsel, had another interview with the defendant and informed him that it was impossible for the assistant to meet·the defendant, but that the assistant had deputed a wardman or detective in the office, in whom he had confidence, to meet the defendant and receive from him his proposition, and it was through Meloy that the defendant and the detective finally connected with each other. When Meloy met the defendant he concealed from

the latter the fact that he had an interview with the district attorney and that there was a plan on foot to entrap him. Subsequently the detective and the defendant connected with each other over the telephone and as a result of that connection they met at a certain restaurant in the city at about three o'clock on the afternoon of the thirty-first day of March, 1903. In this interview the defendant told the detective that these indictments had been found against Dr. Flower, and that he could withdraw them and misplace them; and he suggested to the detective, who claimed to represent the district attorney's office, that he could withdraw them, misplace, lose or dispose of them in some way, or the assistant could go into court, or permit him to go into court on a demurrer and have the indictments quashed. All this resulted in a proposition by the detective to procure the indictments and deliver them to the defendant on payment of $1,750. On a subsequent interview, at the same place, the detective and the defendant met and the former received the money, produced the indictments, handed them to the defendant, who put them in his pocket, and thereupon the detective and a policeman, who was outside the door looking on, immediately arrested the defendant, and, of course, the detective took the indictments away from him, and here the heroic farce ended. The rest is judicial history.

It will be seen from this statement that all the defendant did was to disclose to Meloy his corrupt purpose to bribe the district attorney. That, of course, was bad enough, and he could have been arrested after the disclosure under the provisions of the Code for the prevention of crime and could have been required to give security for his good behavior. (Code Crim. Proc. §§ 82 to 90.) It will be seen also that everything else in the transaction which subsequently took place was aided, induced, procured and consummated by the state itself acting through its officers and agents.

The six indictments in question were doubtless records within the meaning of the statute. The law requires that such records be filed with the clerk and remain in his office as public records, not to be shown to any person other than a public officer until the defendant has been arrested. (Code Crim. Proc. § 272.) But the statute permits them to be removed by order of the court, specifying that the production of the original, instead of the transcript, is necessary. It must be assumed, and in fact it appears, that the district attorney procured the delivery of the indictments to him in compliance with law. No one suggests that he or any one else purloined or obtained them by any fraud or in any illegal way. Hence he had the lawful possession and custody of the records, and as authorized agent voluntarily delivered them to the defendant for a moment, intending all the time to take them back. In other words, the custodian of the papers, as they went into the pocket of the defendant, had a string tied to the package which enabled him in a moment to resume the actual possession. There was not a moment of time when these records were not surrounded by the legal protection that they would have had if never removed from the proper office. There were two detectives looking on, and constructively, if not actually, they were in the possession of these papers all the time. There never was a time when the defendant had in any legal sense any dominion over them, or the opportunity to remove or destroy them. The statute declares that ''A person is guilty of grand larceny in the second degree who, under circumstances not amounting to grand larceny in the first degree, * * * steals or unlawfully obtains or appropriates * * * a record of a court or officer, or a writing, instrument or record kept, filed or deposited according to law, with, or in keeping of any public office or officer.'' (Penal Code, § 531.) It also declares that ''An act, done with intent to commit a crime, and tending but failing to

effect its commission, is an attempt to commit that crime."
(Penal Code, § 34.) Now, what act is imputable to the
defendant that was done with intent to steal the records?
We know that he intended to bribe the district attorney.
But the only thing done in the whole transaction by the
defendant was to put the records in his pocket for a mom-
ent, after having them voluntarily handed to him by the
detective, and they were immediately taken away from him.
There was no intention on the part of the detective to do
anything but to carry out a plan previously formed, to which
the defendant was not a party, and under these circumstan-
ces there was not, in law, any delivery whatever. The
crime charged would have been just as well supported if the
defendant had done nothing more than to touch the papers
with his little finger. He did nothing except what the state,
acting through its officers and agents, wanted him to do—
solicited, persuaded, tempted and procured him to do—and
I may add that the officers would have been grievously dis-
appointed and chagrined had the defendant acted otherwise
than he did. And if he had re used to touch the papers he
would have been just as guilty then of stealing, or of an
attempt to steal, as he is now.

The defendant is charged in the indictment with having
done something "against the peace of the People of the
State of New York and their dignity." How far the peace
of the state has been disturbed or its dignity violated or
insulted will appear from what has already been stated.
The state has taken advantage of a man with an evil and
corrupt disposition—a man who was willing to commit a
crime—and through its officers has tempted and procured
him to put six indictments in his pocket, and then complains
that its peace has been disturbed and its dignity violated.
The question arises here whether this farce constitutes a
criminal offense. There is no complainant or third person
in this case against whom the injury was inflicted. There is

nobody but the state itself and the defendant ; and it seems to me that there could be no crime committed by the defendant in accepting the indictments, because it was with the full consent of the state Volenti non fit injuria. And herein this case differs widely from any other existing precedent. I have said that the state was an aggressive voluntary actor in this transaction. The state was the owner and custodian of these indictments. It permitted them to be taken from the clerk's office by its laws and its courts and to be placed in the custody of its prosecuting officer, and in all that he did with these records he represented the state. The state existing only as an artificial and impalpable being could not act without agents, and, hence, the district attorney, for all the purposes of this case, and for the purposes of the administration of criminal justice, is the agent of the state and his acts are imputable to the state and to the People ; and, hence, the delivery of the indictments to the defendant by authority of the district attorney was an absolute consent on the part of the state to the defendant to receive them. Hence, the state, instead of seeking to redress a wrong, which had ensued from a violation of the criminal law, evidenced by the defendant's threat to bribe one of its public officers, stooped to conspire, to entice a man to commit a crime and become a criminal. The representative of the state took its records and sought to make their voluntary delivery to the defendant a crime. This court has held that a process server, employed by a railroad company to subpœna witnesses to testify in a pending suit, represented the company and acted within the scope of his duty and employment when engaged in an attempt to bribe witnesses to testify falsely in the case. That, although an attempt to suborn witnesses was unlawful, yet the act of the agent bound the principal and his unlawful act would be imputed to the corporation. (Nowack v. Met St. Ry. Co., 166 N. Y. 433.) In view of this decision it is difficult to see upon

what ground or for what reason it is asserted in this case that the district attorney's office did not represent the state and that the acts of the detective, set in motion by the office, cannot be imputed to the state.   If the public prosecutor and his detective did not represent the state they did not represent the law, and if they did not represent the law they must as mere private persons have been using records of the criminal courts in eating houses and other public places in order to tempt the unwary.

I have said that there was no precedent in this state to uphold this judgment, and fortunately that is true.   There are precedents that justify the state and its officers, when a crime has been committed, to entrap the perpetrator by acts, admissions or circumstances ; or, in other words, to procure evidence to convict a party of a crime with which he is charged.   All the cases cited seem to be authorities of that character.   I have no comment to make upon them, but I think it may be safely asserted that never before in this state have the courts been called upon to pass on a case where the crime was created by the act, advice and procurement of the commonwealth.   But while it is true that no prosecution like this has ever come before any of the courts of this state, our sister states have not been so fortunate.

The law upon the subject is well discussed in the case of State v. Hays (105 Mo. 76).   In that case the accused proproposed to another to commit burglary of a storehouse. The other consented, or pretended to consent, but like Meloy in this case proceeded to inform the authorities, and then went with the accused to the storehouse, entered it by raising a window with the assistance of the accused.   He handed out a piece of bacon to the accused, who assisted him out of the building.   The accused took the bacon and was arrested while carrying it away, the whole transaction having previously been arranged with the authorities.   It

was held that the accused could not be convicted of either burglary or larceny.

In State v. Hull (33 Ore. 56) the accused had been convicted of stealing cattle. It appeared, however, that a person employed by the owner to detect suspected thieves, of which the defendant was one, co-operated, or pretended to co-operate, with them or with the accused in planning and carrying out the larceny and asportation. It was held that it was not larceny and the conviction was reversed. The case of People v. Collins (53 Cal. 185) is to the same effect.

The principle at the bottom of all the cases is this, viz., that a person decoyed by others into the doing of some act that otherwise would be a crime is no criminal in the eye of the law, unless the persons inducing or procuring him to do the act were themselves criminals intending to commit the crime. Hence the defendant in this case committed no crime, unless Meloy and the district attorney themselves intended to and did commit a crime. But that hypothesis is simply absurd.

In State v. Stickney (53 Kan. 308) the court said : "If Payne was employed by the owner to open the door and decoy the appellant within the building, and the entrance was with the consent of the owner, then certainly the appellant cannot be held responsible for a burglarious entry."

In Williams v. State (55 Ga. 391) the court said: "It is difficult to see how a man may solicit another to commit a crime upon his property and when the act to which he was invited has been done be heard to say that he did not consent to it. In the present case, but for the owner's incitement, through his agent, the accused may have repented of the contemplated wickedness before it had developed into act. It may have stopped at sin, without putting on the body of crime. To stimulate unlawful intentions, with the motive of bringing them to punishable maturity, is a danger-

ous practice.    Much better is it to wait and see if they will not expire.    Humanity is weak ; even strong men are sometimes unprepared to cope with temptation and resist encouragement to evil.''

In People v. McCord (76 Mich. 200) the court said: ''But our duty to public justice and decency requires us to dispose of the other views of the case.    In some of the features it is one of the most disgraceful instances of criminal contrivance to induce a man to commit a crime in order to get him convicted that has ever been before us.    If the prisoner's statement is believed, and the court in the latter part of the charge seems to have assumed it was probable, he was not the active agent in the crime, but guilty of aiding and abetting Flint, and, therefore, only guilty if Flint was guilty.    It would be absurd to hold Flint guilty of burglary. He did what he was expected to do, and had no such intent as would hold him responsible.    It may be true that a person does not lose the character of an injured party by merely waiting and watching for expected developments.    Possibly—but we do not care to decide this—leaving temptation in the way without further inducement will not destroy the guilt in law of the person tempted, although it is a diabolical business, which if not punishable probably ought to be. But it would be a disgrace to the law if a person who had taken active measures to persuade another to enter his premises, and take his property, can treat the taking as a crime, or qualify any of the acts done by invitation as criminal.    What is authorized to be done is no wrong in law to the instigator.''

In Love v. People (160 Ill. 501) the court said:    ''Acts, otherwise criminal, done by a party against property at the instigation and by the encouragement of a detective, who acts in pursuance of a plan previously arranged with the owner of the property, do not constitute a crime.    *    *    *

If he could make the criminal and induce the commission

of the crime and cause the arrest of the actor, or throw around him a web of circumstances that would lead to a conviction, it would redound to the glory of his chief and cause his advancement. With him the end justified the means, and the reputation of the agency to which he belonged and his own advancement were apparently his object. Such means and agents are more dangerous to the welfare of society than are the crimes they were intended to detect and the criminals they were to arrest. * * * Strong men are sometimes unprepared to cope with temptation and resist encouragement to evil when financially embarrassed and impoverished. A contemplated crime may never be developed into a consummated act. To stimulate unlawful intentions for the purpose and with the motive of bringing them to maturity so the consequent crime may be punished is a dangerous practice. It is safer law and sounder morals to hold, where one arranged to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act by one acting in concert with such owner, that no crime is thus committed. The owner and his agent may wait passively for the would-be criminal to perpetrate the offense, and each and every part of it for himself, but they must not aid, encourage or solicit him that they may seek to punish. After a careful consideration of the evidence in this record, and with a deliberative regard for the importance of the question under discussion, we are constrained to hold the evidence does not sustain this conviction. The judgment is reversed and the defendant is ordered discharged."

In Connors v. People (18 Colo. 373) the court said: "In the case under consideration, the only evidence of the inception of the scheme to rob the express company is that of Holiday, who states that it was instigated by his superiors at St. Louis, and by him suggested to the plaintiffs in error. It further appears that before the consummation of the con-

spiracy the officers of the express company were informed of and consented to the scheme; hence, under the foregoing authorities, the prosecution cannot be sustained. We do not wish to be understood as intimating that the services of a detective cannot be legitimately employed in the discovery of the perpetrators of a crime that has been, or is being, committed, but we do say that when, in their zeal, or under a mistaken sense of duty, detectives suggest the commission of a crime and instigate others to take part in its commission in order to arrest them while in the act, although the purpose may be to capture old offenders, their conduct is not only reprehensible, but criminal, and ought to be rebuked, rather than encouraged, by the courts."

In O'Brien v. State (6 Tex. App. 665) the court said : "When the officer first suggests his willingness to a person to accept a bribe to release a prisoner in his charge, and thereby originates the criminal intent and apparently joins the defendant in a criminal act first suggested by the officer, merely to entrap the defendant, the case is not within the spirit of said Article 307 of the Criminal Code."

In Commonwealth v. Bickings (12 Dist. Repts. [Pa.] 206) the court said : "The liability of men to fall into crime by consulting their interests and passions is unfortunately great, without the stimulus of encouragement. No state, therefore, can safely adopt a policy by which crime is to be artificially propagated. * * * This is virtually the case of a detective who, by promising to perpetrate a crime, lures an innocent man into aiding and abetting it, the object being, not the perpetration of the crime, but the luring of the abettor. Such a proceeding is not a reality, but merely a tragical farce, in which the detective, masquerading as a criminal, captivates the unsophisticated defendant, and then, with mock heroics, denounces him."

These cases and many others that might be cited show very clearly the character of the prosecution disclosed by

the record as it is understood and treated in the criminal law. This court, in its indignation at the defendant's project to bribe a public officer, should not lose sight of its own duty and dignity. No court can afford to close its ears against reason, to ignore logic and to brush aside legal principles in order to put some miscreant for a few months in jail. We cannot affirm this judgment without adopting and approving all the acts and proceedings which enter into the judgment and form a part of it. I am not disposed to criticise the learned district attorney for doing what he supposed to be his duty. No doubt he acted honestly. But this court has its own duty and responsibility. If the prosecuting officers of the state can tempt every evil-disposed person into overt criminal acts and then prosecute them, there is an opportunity, doubtless, to fill the prisons to overflowing. But I think we ought not to approve of that at the expense of destroying fundamental maxims of the law.

We cannot affirm this judgment without holding that fraud does not vitiate every transaction. If it is committed by the state, through its officers and for the purpose of procuring evil-disposed persons to manifest their corrupt intentions by overt acts, then, according to the judgment in this case, the fraud is not only lawful but commendable. We cannot hold that the end always justifies the means. We cannot hold that it is more important that one evil-disposed person shall be put in prison than that ninety-nine innocent persons be acquitted. It is not the law yet that in criminal cases, where there is a doubt upon the law or the facts, the People, and not the accused, shall have the benefit of it. It is still law, at least in theory, that a person is to be presumed innocent until shown to be guilty. It seems to me that some or all of these fundamental maxims have been ignored in this case, and nothing has been seen except the evil purpose of the defendant to bribe a public officer. If this defendant is in law guilty of attempting to steal the papers

that were handed to him by the detective, I have no comment to make upon the conduct of the officers who devised
and carried out the plan. It may be that they might be
considered public benefactors, as possessing the zeal and the
vigor to punish evil intentions. But I am not prepared to
make this court a party to the transaction by giving it
approval, as it must logically, if this judgment is affirmed.

The argument of the learned court below in support of
the conviction rests upon a single proposition, which I quote
from the opinion. ''Having proposed the scheme and set in
motion the forces by which the indictments were actually
removed from the files of the court and delivered to him,
every act from the inception of the scheme to its final consummation by the delivery of the indictments was the act of
the defendant, no matter by whom it was performed, and it
constituted him a principal in the transaction.'' The fallacy
of this proposition consists entirely in its application, since
every one will admit that a party who employs or procures
another to commit a crime is a principal. Whatever other
persons acting as his agents do in furtherance of the crime
may be imputed to the one who set the forces in motion.
No one questions this rule of law. But did the defendant
set the district attorney and his staff in motion? Were they
his instruments and agents in the scheme to steal the
records? If so, they were criminals worse than the defendant, since they were the sworn officers of the law and
intrusted, for the time being, with the custody and safekeeping of the records. Were they doing the defendant's work
and engaged in promoting and effectuating his evil purpose
to bribe them? If the proposition quoted is correct as applied to this case, it logically follows that they were certainly
guilty of all these things. But that is only a distorted view
of the facts, since they were not acting for the defendant.
They were not his agents in crime and in no legal and proper sense did they represent the defendant. The whole

scheme that was finally consummated in the saloon when the detective succeeded in getting the records in the defendant's coat pocket for an instant of time originated with themselves. There was not and could not have been any crime whatever, without the active aid, procurement, encouragement and connivance of these public officers and hence there was not in law any crime at all. There was an evil purpose in the defendant's mind which was never carried out or consummated. The proposition of the learned court quoted above virtually and logically represents the district attorney's office as aiding the defendant, and, therefore, as an agency for the perpetration and promotion of crime. How much more reasonable, charitable and just it would be to present the office and its occupants in the true light, namely, as representing the state and acting for it in all that was done.

I should be surprised if the learned, able and honest district attorney would desire to be represented as acting in any other capacity, and I will add it is much more complimentary to him to treat the transaction in the saloon when the records were produced by his detective as a mere farce or experiment rather than a crime which, if committed at all, was by his aid, advice and procurement. It was not only harmless, but the whole performance was absolutely silly, since copies of the six indictments were in the district attorney's office, and the loss of the originals could not embarrass the prosecution in the least. The defendant, though a lawyer himself, evidently did not see what a silly project the whole scheme was, but certainly the district attorney, his assistant and detective must have known. The genius and vigilance that can convert evil thoughts into criminal acts might be admired, but on sober reflection no public officer can think it fair or proper to be represented as giving aid, advice or assistance to an evil-disposed person that may enable him to do or appear to do the things that

constitute a crime. It is plain from the opinions that I have quoted from the courts of sister states that those tribunals entertain no such views of this transaction as those expressed by the learned court below in this case. These cases hold that such a transaction does not amount to any crime, and in my opinion they are the expression of good sense and sound law. That view is safer for the public and much more charitable to the officers themselves. I would not give to them the character of agents carrying out the defendant's evil purpose, but rather as engaged in a harmless farce or experiment. The fundamental question in this case is plain and simple, and it is this : Can the state, through one of its own officers and agents, on learning that one of its citizens harbors criminal designs in his mind and has a criminal inclination, enter upon a plan to tempt him, suggest to him what to do in order to accomplish his criminal purpose, take records from the files in pursuance of the plan and deliver them for a sum of money previously agreed upon; all conceived and carried out in fraud for the very purpose of decoying the person into some criminal act in order to prosecute him for the same upon the sole ground that its peace and dignity have by that act been insulted and violated? I have no hesitation in asserting that an act thus procured and manufactured cannot be a punishable crime either in the domain of law, of morals or of common sense.

It has been said, with perhaps much truth, that it is and always has been the natural disposition of mankind to reverence law more in its high abuses and summary movements than in its calm and constitutional energy when it dispensed blessings with an unseen but liberal hand. Courts cannot inspire much respect for the majesty and dignity of law or the orderly administration of justice when they depart from sound and settled principles in order to crown with success the traps devised by public officers to decoy evil-minded persons into the commission of acts which, under other circum-

stances, would be criminal. When the state and its officers come into a court of justice demanding the punishment of a person accused of crime they ought to appear there with clean hands and not as a part of the forces that procured the consummation of the unlawful act.

The highest and most enlightened court is liable to be misled by plausible and distorted arguments. But in this case the wayfaring man cannot err since he has the force of reason and the light of authority to guide him. This judgment can be affirmed with the strong hand of power, but it is quite useless to try to cover it with a glamour of reason or law. The evil purpose of this defendant, never consummated, ought not to have any more influence over the question involved in this case than the smallest pebble on the shore over the turbulent and angry waves of the sea. I think the approval of this judgment is a bad precedent, since we cannot escape adopting acts and arguments that are only a virtual modification of the arguments in support of lynch law. It is not worth while for this court to become a party to this transaction for the sake of sending this defendant who, so far as we know, is a bad man, to a prison for a few months.

There was a ruling made by the learned trial judge which seems to me should not be ignored. The People were permitted to prove that about the time the transaction referred to took place an assistant district attorney was engaged in investigating the cause of the death of a man named Hagaman. The assistant himself was put upon the stand and he testified that the body had been exhumed ; that an autopsy had been performed; that the record of the pathologist had been received ; that the organs of the dead man had been preserved and were in process of a chemical analysis by the expert ; that Dr. Flower, supposed to know something about the conditions surrounding the death, had been examined and the written statements taken; that the autopsy was held at Poughkeepsie where Hagaman was buried. All these

things he said took place in January or February previous to the transaction in question. The assistant testified that as head of the homicide bureau he had charge of the proceedings against Flower; that the matter had been submitted to the grand jury and that the assistant had collected the evidence.

Now what all these matters, had to do with the question before the court, which manifestly was whether the defendant stole or attempted to steal the indictments when he put them in his pocket for a moment in the saloon, it is utterly impossible to conceive. The defendant was not indicted for or charged with bribery nor for any complicity or connection with the death of Hagaman. It seems that it was a subject that had been widely discussed in all the papers and the name of Flower, the defendant's client, had been connected in some way with the matter. The evidence was all objected to by the defendant's counsel, the objections were overruled in every case and exceptions taken. This evidence could serve only one purpose and that was to present the defendant before the jury as an associate, friend and counselor of a man who was suspected, if not accused, of murder. The ruling of the learned trial judge admitting this evidence against the defendant's exception and objection was manifestly prejudicial to the defendant's rights to a degree which is difficult to describe. If the defendant had been indicted for bribery or for an attempt to bribe the district attorney or his assistant, it is possible that this evidence could be justified, but a motive for the commission of one crime is not evidence in the prosecution for another and different offense. It seems to me that the ruling embodies a fatal error, and even if the testimony was not as clearly incompetent on its face as it appears to be, the presumption is that it prejudiced the accused under the settled rule of this court. (People v. Koerner, 154 N. Y. 377; People v.

Helmer, Id. 603; Stokes v. People, 53 id. 183; Greene v. White, 37 id. 405.)

The judgment of conviction should be reversed and a new trial granted.

BARTLETT, J. (dissenting).

I concur in the result reached by Judge O'Brien.

It is argued that the error in the reasoning of counsel for the defendant consists in assuming that the district attorney and his detective represented the state of New York in the scheme devised in the district attorney's office to entrap the defendant. I deem this the crucial point in the case. The district attorney and his detective undoubtedly acted upon the theory that they were representing the state and doing it a great service in bringing this defendant into a situation that would result in conviction, and, as they supposed, merited punishment. This was an unfortunate error of judgment.

It is a violent assumption, under the circumstances, that the district attorney and his detective were acting as private citizens and the state was not bound in any way by what they did. The state as a legal entity can only be represented by officers duly authorized to exercise certain of its powers resting in its absolute sovereignty.

In the case at bar, according to the testimony of the People's witnesses, the district attorney was advised that the defendant had expressed the desire to one of these witnesses to bribe an assistant district attorney to withdraw, misplace or lose the six indictments against Flower, or go into court and oppose a motion to quash the indictments in such a manner as to permit it to succeed.

This wicked purpose to bribe an official, existing in the mind of the defendant and communicated to a man whom he

supposed was his friend, represents his extreme position at the time the district attorney was advised that one of his assistants might be improperly approached. No crime had been committed or attempted.

It will be observed that according to the People's witnesses, the intention lurking in the defendant's mind was bribery. He did not contemplate getting possession of the indictments himself, his idea being that the assistant district attorney, if capable of being bribed, might lose or misplace them, or defend in a half-hearted manner a motion made to quash them.

At this juncture the scheme was devised in the district attorney's office of allowing one of its detectives to place himself in communication with the defendant and assure him that he sustained such relations to the district attorney's office and assistant district attorney as would serve his purpose. This plan was carried out and resulted in leading the defendant into the supposed commission of two entirely distinct crimes, to wit: (1) An attempt to commit the crime of willfully, etc., removing, etc., a public document, i. e., certain indictments, in violation of section 94 of the Penal Code; (2) the crime of attempted grand larceny in the second degree by attempting to steal the aforesaid indictments.

This was not a scheme or device to detect crime already committed, wherein secrecy and deception are often resorted to in order to bring the guilty to punishment, but it was a plan to entrap the defendant, who, up to that time, had committed no crime whatever, but was planning in his own mind a wicked scheme to bribe an assistant district attorney.

In order to carry out the scheme of the district attorney it required the exercise of the great power and discretion confe ed upon him by law. The indictments in question were c file in the clerk's office, and no court or officer had the power under the law to remove them for the purposes con-

templated by this scheme. (Code of Civil Procedure, § 866.) This section permits records to be brought into court in the custody of a clerk when necessary, and when they are required at any other place they may be removed by order of the court, specifying that the production of the original instead of the transcript is necessary.

The district attorney obtained this order of the court and secured the possession of the indictments in question, giving his official receipt therefor. Nevertheless, this defendant is indicted for attempting to remove filed documents from a public office and attempting to steal the same. The indictments were removed from the files of a public office by the district attorney and were in his official custody and control every moment of time until they were returned to the proper custodian and the receipt given for the same taken up.

The farce enacted in the saloon where this defendant was surrounded by the officers of the law shocks the sense of justice, and if the state disapproves this mode of procedure it should renounce its unsavory fruits, which include two thousand dollars, more or less.

In order to reach the conclusion that the district attorney did not represent the state in devising and carrying out this scheme, we are compelled to regard him merely as the agent of the state, exceeding his authority in the premises.

I am of opinion that this familiar principle of the law of agency has no application to this case. It is essential that the sovereignty of the state should be duly represented by its officials and there is no valid reason why it should not be bound by the action of the district attorney when he commits a grave error of judgment. The argument that the district attorney and his detective did not represent the state in this prosecution permits the inference that if they did this conviction could not stand.

It is contrary to public policy and sound reason, when a defendant is entrapped by the district attorney's office into

the commission of a crime he did not originally contemplate, that the state should be able to say it will treat the alleged criminal precisely as if the crime for which he was indicted originated in his own wicked intention, unaided by the officials who claim to represent it and who deliberately induced him to act.

In the case of Love v. People (160 Ill. 501), cited by defendant's counsel, the court held: "Burglary is not committed by those assisting a detective in entering a building and taking money from a safe in pursuance of a previously arranged plan between him and the owner with the sole intent of entrapping the others into the apparent commission of a crime. Acts otherwise criminal done by a party against property at the instigation and by the encouragement of a detective, who acts in pursuance of a plan previously arranged with the owner of the property, do not constitute a crime."

Numerous cases laying down this same principle of law are cited from various states.

A sound public policy requires that the state of New York should be estopped, as is a private individual, who seeks to induce a person by scheme or device to commit a crime.

It well comports with the dignity of the state to say that it repudiates this action of its officials and permits this defendant, although unworthy, to go free, because he stands convicted of a crime which he never would have attempted and could not have committed save by the assistance of those who on this occasion, however proper their motives, have misrepresented it.

I vote for reversal.

PARKER, Ch. J., HAIGHT, CULLEN and WERNER, JJ., concur with VANN, J.; O'BRIEN and BARTLETT, JJ., read dissenting opinions.

Judgment of conviction affirmed.

# NOTE ON "THE COMPETENCY OF EVIDENCE IRREGULARLY OBTAINED."

This note was published in substance, as an editorial in the New York Law Journal, May 9, 1904.

The opinion in the Mills case (supra), when read in connection with the opinion of the Appellate Division below (91 App. Div. 331; 18 N. Y. Crim. 126) affords an interest-illustration of the legitimate use of traps and decoys for the purpose of obtaining evidence of crime.

Apropos of this Mills case, it may serve the profession to collect, in convenient compass, a number of scattered decisions which show how steadfastly the New York courts have disregarded sentimental considerations in passing upon the competency and weight of evidence. If evidence is competent, the tendency of the decisions, particularly in recent years, has been to ignore the method by which it was obtained, whether that method involved force or fraud.

In the matter of confessions, for example, the English rule regulating their admission was so strict that Baron Parke, in Reg. v. Baldry (2 Den. C. C. 430, 455; S. C. 5 Cox C. C. 523) declared that in its application justice and common sense had been too frequently sacrificed at the shrine of mercy, and this remark was repeated by Harlan, J., in Hopt v. Utah (110 U. S., 574). A recent New York case sustained the admission of a confession, though it was secured by gross deception, an officer of the law having ingratiated himself into the confidence of the prisoner as a supposed friend (People, &c., v. White, 176 N. Y., 331; 17 N. Y. Crim. 538). The opinion of the Court of Appeals cites a number of like decisions, and declares that the doctrine has met with the sanction of courts of high authority.

As for detective evidence generally, the New York courts have declared that it is necessary to resort to this mode of ascertaining whether criminal acts have been committed,

and that without its use the authorities would be helpless (People, &c., v. Noelke, 29 Hun, 461; 1 N. Y. Crim. 252; aff'd 94 N. Y. 137; 1 N. Y. Crim. 495). The Court of Appeals has recently said that the rule that the evidence of detectives and prostitutes should receive some corroboration is, after all, only a rule for the guidance of the judicial conscience (Winston v. Winston, 165 N. Y., 553); and in this respect it corrected a misapprehension of two of its previous opinions (Moeller v. Moeller, 115 N. Y., 466; McCarthy v. McCarthy, 143 N. Y., 235), which had been construed as absolutely requiring corroboration of such evidence. The courts have systematically refused to consider private detectives to be accomplices (People, &c., v. Noelke, 94 N. Y., 137; 1 N. Y. Crim. 495). If detectives occupy an official or semi-official position, such as agent of an incorporated society or an agent of the excise department, the courts have held that they are not to be ranged in the same category as persons hired to procure evidence, nor as ordinary detectives (People ex rel. Simermyer v. Roosevelt, 2 App. Div., 498; Cullinan v. Trolley Club, 65 id., 202; Cullinan v. Rorphuro, 93 id. 200.)

The use of decoy letter evidence has been declared to be both proper and necessary (Grimm v. United States, 156 U. S., 604; Goode v. United States, 159 U. S., 663; Rosen v. United States, 161 U. S., 29; Andrews v. United States, 162 U. S., 420). Our Court of Appeals followed and cited the Grimm case in a recent case where testimony had been procured by a decoy (People, &c., v. Krivitzky, 168 N. Y., 182; 16 N. Y. Crim. 63).

Passing from evidence obtained by deception and fraud to evidence obtained by force, we find similar rulings. The earlier authorities indicate a tendency to exclude such evidence upon the ground that it compelled the person against whom it was offered to be a witness against himself, in violation of his constitutional right. Thus, in 1873, a woman was tried for murdering a bastard child. While she was in jail she submitted to an examination by two physicians to ascertain whether she had been recently delivered of a child, having been told that if she did not permit the examination force would be used to compel her to allow it. Upon the

trial the evidence of the physicians was offered, but was excluded (People, &c., v. McCoy, 45 How. Pr., 216). Recent Court of Appeals cases indicate a different policy on the subject. Thus, the court held that to compel a defendant to stand up in court for the purpose of being identified did not invade his constitutional privileges (People, &c., v. Gardner, 144 N. Y., 119; 9 N. Y. Crim. 404; 1894); also that the taking of the defendant by the sheriff to a room outside of the jail, and the examination of him by experts employed by the People for the purpose of ascertaining his sanity, did not invade his constitutional privilege (People v. Truck, 170 N. Y. 203; 16 N. Y. Crim. 342; 1902) also that where the shoes of the defendants were forcibly taken from them and compared with footprints in the snow, evidence of correspondence of the shoes with the footprints was not inadmissible (People, &c., v. Van Wormer, 175 N. Y., 188; 17 N. Y. Crim. 359, 1903).

The latest cases have, it is believed, finally settled the proposition that the forcible seizure, or illegal obtaining by other means, of books, papers, &c., is no valid objection to their use in evidence if they are pertinent to the issue. The general doctrine had been stated as a theoretical proposition (see Greenleaf on Evid., vol. 1, sec. 245a), and in New York, at least, it is now a practical rule of law. In the recent Adams policy case a number of manifold sheets, together with other strictly private papers, were taken from the defendant's office which had been searched under a search warrant. They were ultimately introduced in evidence against the defendant over his objection that the result was to compel him to give evidence against himself in violation of his constitutional right. The courts held that the evidence was pertinent, and that the trial court was not under any duty to take notice how it had been obtained, or to frame issues to determine that question; it was pointed out that the objections raised to the evidence did not involve any question of its relevancy, but raised "collateral issues" which the trial court could not undertake to determine (People, &c., v. Adams, 176 N. Y., 351; 17 N. Y. Crim. 558; aff'd sub nom. Adams v. N. Y., 192 U. S., 585).

The judicial attitude at the present day towards all evi-

dence of the class in question is pithily indicated by Judge Vann in the Mills case: "The courts do not look to see who held out the bait, but to see who took it."

R. C. T.